Argued and submitted July 20, 2000, reversed January 31, 2001

In the Matter of
Visitation with Nicholas L.K. Daum
and Alexander N.G. Daum, Minors.

Bruce HARRINGTON,
*Respondent,*

*v.*

Randi DAUM,
*Appellant.*

(97-3456; CA A108204)

18 P3d 456

Mark Kramer argued the cause for appellant. With him on the brief were Rebecca A. Burwell, and Kramer & Associates.

John P. Salisbury argued the cause for respondent. With him on the brief was Salisbury & Olsen.

Michael C. Livingston, Assistant Attorney General, Salem, filed a brief *amicus curiae* for the Attorney General of the State of Oregon.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

### EDMONDS, P. J.

Randi Daum (father) appeals from a judgment that awarded Bruce Harrington (petitioner) visitation rights with father's two sons, who were 7 and 8 years old at the time of trial. ORS 109.119. Father argues that the statute, construed in light of his constitutional right to make decisions concerning his children, does not permit the trial court to award visitation to petitioner over father's objection under the facts of this case. On *de novo* review, ORS 19.415(3), we agree and therefore reverse.

There is little dispute over the facts; we state them as we find them on *de novo* review. The marriage between father and the children's mother was dissolved in November 1995. The dissolution judgment awarded custody of the children to mother and gave father substantial visitation rights. About a month after the dissolution became final, petitioner met mother, and they began dating. By February 1996, petitioner and mother were seeing each other several times a week, with the children often included. From the summer of 1996 until mother's death in August 1997, mother and petitioner had dinner together most evenings, and mother spent the weekends at petitioner's apartment. The children were included, except when they were with father. Petitioner established a play area in one part of his living room for the children, furnishing it with appropriate toys and stuffed animals. Because he got off work before mother, petitioner usually picked up the children from day care. The children liked petitioner and enjoyed being with him.

In late August 1997, petitioner took the children on an overnight church outing that was limited to men and boys. That weekend, mother died in an automobile accident. After a short dispute with mother's parents, father took custody of the children and moved back into mother's house, which had been the marital home before the dissolution and had remained the children's home thereafter. Petitioner wanted to remain active in the children's life, and father allowed him to see the children several times. Father became concerned, however, over several events that, he thought, indicated that petitioner was undermining his role as the children's parent.

Those events included petitioner's showing the children a videotape that petitioner took at Christmas 1996 of them with mother; father believed that petitioner should have asked him before doing so and that the videotape interfered with the children's ability to resolve the issues that arose from mother's death. Also, petitioner allowed a photographer's assistant to believe that he was the children's stepfather when he picked up their soccer pictures. Petitioner attended the childrens' swimming lessons when father was unable to do so because his work shift ended later, and he did not correct the children when they called him "dad."[1]

Father believed that all of petitioner's actions were intended to undermine his position as the childrens' father and that petitioner was trying to insert himself into a parental role with them. As a result of his concerns, father both limited petitioner's contact with the children and insisted that it occur at his house while he was present. Petitioner was dissatisfied with those limitations and filed this action, in which he seeks a judicial declaration of visitation rights with the children. After three days of testimony, the trial court ruled that both a parent-child relationship and an ongoing personal relationship existed between petitioner and the children. It then ordered visitation, established a schedule, and imposed conditions designed to avoid the problems that father had described.

The trial court acted under ORS 109.119, which establishes a procedure for persons other than parents to seek custody or visitation with a child. Under ORS 109.119(1), any person "who has established emotional ties creating a child-parent relationship or an ongoing personal relationship with a child" may petition for relief under ORS 109.119(3). That statute provides:

"(a) If the court determines that a child-parent relationship exists and if the court determines by a preponderance of the evidence that custody, guardianship, right of visitation, or other generally recognized right of a parent or person in loco parentis, is appropriate in the case, the court shall grant such custody, guardianship, right of visitation

---

[1] The children apparently began using that term in part as a joke and in part because they were not sure what to call petitioner.

or other right to the person, if to do so is in the best interest of the child. * * *

"(b) If the court determines that an ongoing personal relationship exists and if the court determines by clear and convincing evidence that visitation or contact rights are appropriate in the case, the court shall grant visitation or contact rights to the person having the ongoing personal relationship if to do so is in the best interest of the child. The court may order temporary visitation rights under this paragraph pending a final order."

We first consider whether the trial court correctly found that there was a "child-parent" relationship between petitioner and the children. ORS 109.119(6)(a) defines such a relationship as

"a relationship that exists or did exist, in whole or in part, within the six months preceding the filing of an action under this section, and in which relationship a person having physical custody of a child or residing in the same household as the child supplied, or otherwise made available to the child, food, clothing, shelter and incidental necessaries and provided the child with necessary care, education and discipline, and which relationship continued on a day-to-day basis, through interaction, companionship, interplay and mutuality, that fulfilled the child's psychological needs for a parent as well as the child's physical needs."

Under that definition, the trial court erred in finding that there was a child-parent relationship. Although petitioner was close to the children before mother's death, and although he, mother and the children spent a significant amount of time at each other's residences, petitioner and mother maintained separate households. Petitioner was never part of the same household as the children. That fact in itself prevents the finding of a child-parent relationship under the statutory definition. We therefore do not need to decide the extent to which the other criteria in the definition might point towards such a relationship.[2]

---

[2] Petitioner argues that the frequent visits and weekend stays meant that the children resided in his household "in part" during the statutory six-month period. However, the statute requires that the *relationship* "exist, in whole or in part, within the six months preceding" the filing of the action. The reference to "in part," thus, is to *when* the relationship exists. It does not relate to the subsequent description in the statute of the nature of a child-parent relationship.

Father concedes, and we agree, that petitioner established that he had an ongoing personal relationship with the children under ORS 109.119(6)(d). That statute defines such a relationship as having "substantial continuity for at least one year, through interaction, companionship, interplay and mutuality." ORS 109.119(3)(b) requires that, in order to obtain visitation rights, petitioner must show, by clear and convincing evidence, that those rights are "appropriate in the case" and that visitation "is in the best interest of the child." Our initial task is to discern the legislature's intent in promulgating the statute. We do that by examining the language of the statute in context with its interpreted meaning.

In *Shofner and Shofner*, 137 Or App 543, 905 P2d 268 (1995), *rev den* 322 Or 644 (1996), we discussed the application of an earlier version of ORS 109.119 to a former stepparent who had established a child-parent relationship with the child. We held that the standard of *Hruby and Hruby*, 304 Or 500, 748 P2d 57 (1987), which requires a showing of compelling reasons to award custody to someone other than a natural parent, does not apply to an award of visitation. We disagreed with the parents' argument that statutory changes since *Hruby* had affected that conclusion. 137 Or App at 548-49. We also noted that the Supreme Court had held in *Hruby* that ORS 109.119 was purely procedural and did not grant any substantive rights. Because there were no applicable statutory standards, we looked to general principles of common law and equity to determine the standards for ruling on the former step-parent's petition for visitation. *Id.* at 549-51. Those principles led us to conclude that the court should consider the particular circumstances of the case, including the parents' right to uninterrupted custody, the nature and extent of the visitation sought, and the best interests of the child. *Id.* at 552.

After we decided *Shofner*, the Supreme Court decided *Sleeper and Sleeper*, 328 Or 504, 982 P2d 1126 (1999), in which a step-parent sought custody, not merely visitation. The court held that an 1987 act that amended ORS 109.119(1) to essentially its present form did not import the

"compelling reasons" standard into the statute in a step-parent custody case.[3] The court stated that the addition of the phrase "is appropriate in the case" to the statute requires the trial court to examine the circumstances surrounding the custody dispute to determine whether the best interests of the child require awarding custody to the nonbiological parent. In that respect, it disagreed with our conclusion in *Shofner* that it is necessary to decide whether custody or visitation is appropriate before considering the best interests of the child. 328 Or at 509-11. "If the best interests of the child call for custody to the nonbiological parent, then the court must make such award, unless to do so would violate some supervening right belonging to the biological parent." *Id.* at 511.[4]

This case presents the issue not presented in *Sleeper*. Assuming that petitioner has made an adequate showing that the best interests of the children would be served by some amount of visitation with him, the issue is whether his statutory right to court-ordered visitation must yield to father's right to control visitation with the children. Father, relying on several decisions of the United States Supreme Court, argues that the Due Process Clause of the Fourteenth Amendment gives him a supervening constitutional right and prohibits the court from granting visitation rights to petitioner over his objection.

■ Petitioner first argues, pursuant to ORAP 5.45, that father did not raise the constitutional issues that he raises on appeal in the trial court and that we should not consider them. In taking that position, he appears to assume that father is challenging the facial constitutionality of the statute. That is not, however, what father argued either to the

---

[3] In both *Sleeper* and its companion case *Moore and Moore*, 328 Or 513, 982 P2d 1131 (1999), the stepfather treated the children as his own from their birth. In *Moore*, he believed that the child was his biological child until tests during the dissolution proceedings showed otherwise; in *Sleeper*, although he knew that the children were not his biological children, he was married to their mother when they were born and had been their primary caregiver.

[4] Thus, the court treated the statutory requirement of showing that custody or visitation is appropriate as being part of considering the best interests of the child rather than as being an independent determination.

trial court or on appeal. Rather than asserting that ORS 109.119 is unconstitutional, father argues that his federal constitutional right to the care, custody, and management of his children affects the application of the statute to this case. He made that point at trial in his trial memorandum, in his motion to dismiss, and in his closing argument. On appeal, he emphasizes that he is not making a facial challenge to the statute but is arguing that its application to this case unconstitutionally interferes with his right to raise his children. We hold that father preserved that argument below.

At trial and in his original brief on appeal, father relied on several United States Supreme Court cases to support his argument. Thereafter, the Court decided *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), which is now the leading case on the subject. The issue in *Troxel* was the constitutionality of a Washington statute that authorizes a court to award visitation to any person at any time if it is in the child's best interests to do so. The parties to the case were the children's mother, who restricted visitation with their paternal grandparents after the father's death, and the grandparents, who sought and received additional visitation rights under the statute. The Washington Supreme Court first construed the statute broadly and then held that, as so construed, it was unconstitutional. The United States Supreme Court affirmed in a decision that did not produce a majority opinion of the court.

Writing for a plurality of four justices, Justice O'Connor first noted that a number of the Court's previous cases have held that parents have a liberty interest in the care, custody, and control of their children. *Troxel*, 530 US at 65-66. She then stated that the Washington statute, as construed by that state's highest court, "effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review." *Id.* at 67. The statute contained no requirement that the court accord the parent's decision any presumption of validity or any weight whatsoever. If the judge disagreed with the parent's view of the child's best interests, the judge's view prevailed.

"Thus, in practical effect, in the State of Washington a court can disregard and overturn *any* decision by a fit custodial parent whenever a third party affected by the decision files a visitation petition, based solely on *the judge's determination of the child's best interests.*" *Id.* at 67 (emphasis in original).

Because the statute gives no weight to the decision of a fit custodial parent, the plurality concluded that it unconstitutionally infringed on a parent's right to make decisions for his or her children.

Although some statements in its opinion might suggest otherwise,[5] the plurality did not eliminate all roles for a court concerning visitation issues. It recognized that every state has some sort of grandparent visitation statute, most of which are more restrictive than the Washington law in question. What the plurality did emphasize was that the decision about whether to permit visitation is the parent's to make in the first instance. "[I]f a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." The Washington trial court had not done that. In addition, the mother had never sought to cut off visitation entirely but had merely limited it to less than the grandparents wanted. The plurality then declined to consider whether, as the Washington Supreme Court had held, all nonparental visitation statutes had to require a showing of harm to the child as a condition for ordering visitation. Rather, it agreed with Justice Kennedy, who stated in his dissent that the constitutionality of any standard should turn on the manner in which the standard is applied. *Id.* at 94-95 (Kennedy, J., dissenting).

Justices Souter and Thomas filed opinions concurring in the judgment. Justice Souter agreed with the Washington Supreme Court that a statute that authorized any person at any time to seek visitation rights, with the only

---

[5] "[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel,* 530 US at 68-69.

standard being the best interests of the child, was unconstitutional on its face. He did not think it necessary to decide anything more than that. *Troxel*, 530 US at 75 (Souter, J., concurring). Justice Thomas, after noting that neither party challenged the concept of substantive due process, agreed that the recognition of a fundamental right of parents to direct the upbringing of their children resolved the case. Because he would have held that fundamental rights are subject to strict scrutiny, and because the state lacked even a legitimate governmental interest—let alone a compelling one—to second-guess a fit parent's decision regarding visitation, he joined in affirming the judgment. *Id.* at 80 (Thomas, J., concurring).

It appears that Justice Souter would have imposed fewer restrictions on the court's authority to award visitation than would have the plurality, while Justice Thomas would have made such an award much more difficult. We conclude that the plurality opinion gives the best guidance on the effect of the constitution in this situation. That opinion emphasizes that a parent's decision on visitation is entitled to significant weight, but it does not describe precisely the extent to which it will control. It left that issue for development on a case-by-case basis.

■ We turn to the effect of *Troxel* on this case. ORS 109.119 is not as broad as the Washington statute, because it does not permit *any* person to seek custody or visitation. Rather, it is limited to those persons who have either a child-parent relationship or an ongoing personal relationship with the child. *Troxel* does give new significance to the Supreme Court's reference in *Sleeper* to a supervening right of the parent that changes how the statute would otherwise function. Under *Troxel*, the parent's right to make decisions concerning the child's upbringing is such a supervening right. The result is to change the analysis to one that is closer to what we discussed in *Shofner*. As we noted in that case, the statute requires proof that it is appropriate to award visitation to a person before a court may consider whether the best interests of the child justify such an award.[6] In addition, we recognized

---

[6] In *Shofner*, the petitioner had a child-parent relationship with the child, and the statute therefore required proof by a preponderance of the evidence. In this

the parent's right to uninterrupted custody as one of the things that a court should consider. *Troxel* now establishes that the court must give significant weight to a fit custodial parent's decision. That constitutional right is a supervening right that both affects the determination of whether visitation is appropriate and prevents the application of solely a "best interests of the child" analysis.

■ On *de novo* review of the trial court's decision under ORS 109.119, we find no interest of petitioner or the children that can overcome father's right to decide the issue of visitation. We recognize that petitioner is acting in good faith and in accordance with what he believes to be the best interests of the children. The same, however, is true of father. The difference between the two is that the federal constitution places the responsibility for determining the children's best interests in father's hands, not petitioner's, and not, on these facts, the court's. Everything in the record indicates that father is raising the children in a caring and conscientious fashion and that he has not denied petitioner all contact with the children. We conclude that the trial court erred in awarding visitation rights to petitioner on this record.

Reversed.

---

case, petitioner has only an ongoing personal relationship with the children, so there must be proof by clear and convincing evidence.