Argued and submitted June 18, reversed and remanded October 31, 2001

Mitchell D. NEWTON
and Darlene Newton,
*Respondents,*

*v.*

Randy Glen THOMAS,
*Respondent Below,*

*and*

Tina THOMAS,
*Appellant.*

990600; A109008

33 P3d 1056

Lorena Reynolds argued the cause for appellant. With her on the brief was Legal Aid Services of Oregon.

No appearance for respondents Mitchell D. Newton and Darlene Newton.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

SCHUMAN, J.

### SCHUMAN, J.

The trial court resolved this custody dispute between mother and child's paternal grandparents in favor of the grandparents, based on its finding that this resolution was in child's best interest. On appeal, mother argues that the court inaccurately determined the child's best interest. She also argues that the statute authorizing the court to award custody to a nonparent instead of a biological parent if doing so is "in the best interest of the child" violates the biological parent's state and federal constitutional rights, both on its face and as applied in this case. Guided by case law that has developed since trial, and reviewing *de novo*, ORS 19.415(3), we reverse.

■ This case requires us to construe and, if necessary, to determine the constitutionality of ORS 109.119(3)(a),[1] which provided, in relevant part:

"If the court determines that a child-parent relationship exists and if the court determines by a preponderance of the evidence that custody * * * is appropriate in the case, the court shall grant such custody * * * to the person if to do so is in the best interest of the child."

At the time of trial, the definitive interpretation of this statute derived from *Sleeper and Sleeper,* 328 Or 504, 982 P2d 1126 (1999), where the Supreme Court held that the statute

"requires the court to examine the circumstances surrounding the custody dispute and to determine whether the best interests of the child call for an award of custody to the nonbiological parent. If the best interests of the child call for custody to the nonbiological parent, then the court must make such an award, unless to do so would violate some supervening right belonging to the biological parent." *Id.* at 511.

Mother maintained at trial, and maintains on appeal, that the recent decision by the United States Supreme Court in *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49

---

[1] ORS 109.119(3)(a) was significantly amended in 2001. The amendments became effective on July 31, 2001. *See* 177 Or App at 674 n 2. Our references are to the 1999 version.

(2000), rendered application of the *Sleeper* "best interest" standard unconstitutional; *Troxel*, she argues, established that awarding visitation, and, *a fortiori*, custody, to a grandparent instead of a biological parent, merely because the court determined that doing so was in the best interest of the child, and without a significant presumption in favor of the biological parent, violated the parent's rights under the Due Process Clause of the Fourteenth Amendment. The trial court rejected that argument, observing:

> "[T]he current state of the law, at least on paper, is the *Sleeper* case. * * * [The court] said in that case that the best interests of the child standard applies unless to do so would violate some supervening right belonging to the biological parent. But it's clear in the context of that case that they are saying that the supervening right has to be something other than mere biology * * *. A number of times they made it clear that the mere fact that a natural parent is the biological parent does not give them in and of itself an edge on a child custody determination. * * * The legal standard in this case will be that which is set forth in ORS 109.119, the best interests of the child."

After trial but before oral argument, however, this court decided *Harrington v. Daum*, 172 Or App 188, 18 P3d 456 (2001). In that case, we held that *Troxel* required amplification of the *Sleeper* standard, but not rejection of it:

> "*Troxel* does give new significance to the Supreme Court's reference in *Sleeper* to a supervening right of the parent that changes how [ORS 109.119] would otherwise function. Under *Troxel*, the parent's right to make decisions concerning the child's upbringing is such a supervening right. * * * *Troxel* now establishes that the court must give significant weight to a fit custodial parent's decision. That constitutional right is a supervening right that both affects the determination of whether visitation is appropriate and prevents the application of solely a 'best interests of the child' analysis." *Id.* at 197-98.

Both *Troxel* and *Harrington* involved nonparental visitation, whereas this case is a custody dispute. However, we presumed in *Harrington* that *Sleeper*, a custody case, articulated the appropriate standard for visitation, and we see no reason

to apply a less stringent standard here; if anything, a biological parent's "supervening right" to the custody of her child is more important and deserving of more protection than her right to control visitation. We therefore hold that, under ORS 109.119(3)(a), a court may not grant custody to a person other than a biological parent instead of a biological parent based solely on the court's determination of what is in the child's best interest; rather, the court must also give significant weight to the supervening fundamental right of biological parents to the "care, custody, and control of their children." *Troxel*, 530 US at 65.[2]

The trial court, therefore, applied a standard that we have subsequently decided was wrong. We conclude that, under the statutory standard correctly understood, the facts of this case as we find them on *de novo* review do not justify depriving mother of custody.

Mother and father met in Nevada in 1995.[3] In October of that year, they moved to Oregon, where they first lived briefly with some of father's friends and then with his parents before finding a place of their own. After a few months, they discovered mother was pregnant. During the pregnancy, father beat mother, so she moved back to Nevada, where, in October 1996, child was born. Mother was 19 years old at the time.

When child was less than a year old, mother and father reconciled; they married in June 1997. Around Christmas of that year, grandparents first visited child, and shortly after the new year father and mother once again moved to Oregon, where the family moved in with grandparents at their two bedroom home on three acres in Gates. At the time of trial, grandmother was a 42-year-old homemaker who did

---

[2] The 2001 version of ORS 109.119 creates "a presumption that the legal parent acts in the best interest of the child" and requires a court in awarding custody to any other person to make "findings of fact supporting the rebuttal" of that presumption. ORS 109.119(2)(a), (2)(b) (2001). The statute contains a nonexhaustive list of "factors" that may constitute evidence rebutting the presumption. ORS 109.119(4)(b) (2001). This case does not present us with the need to construe the amended statute or to determine its constitutionality.

[3] Father was named as a co-respondent in this case but did not file an answer and consequently was subjected to default, from which he does not appeal. He appeared at trial as a witness on behalf of his parents, the petitioners.

not work outside the home; grandfather was 41 and worked as a truck driver. Mother, father and child remained with grandparents until mother and father found jobs and housing in May 1998. Apparently, the marital relationship foundered once again; in June, father once again physically assaulted mother, this time in the presence of child. Mother called the police and grandparents. Father was arrested for fourth-degree assault (he later pleaded guilty to Menacing and was incarcerated for two months when he violated the terms of his probation). Child went to grandparents' home. Father and mother separated and have not reconciled.

Mother, who had been a sales clerk at a discount department store, at that point decided to move toward financial independence by taking classes in Portland to qualify for a license to sell insurance and to leave child with grandparents during the course. At first, she thought she could complete the course in three weeks, but ultimately it took her considerably longer, and she had to leave without finishing in order to reclaim child. (She completed the course later, in August 1998.) Her departure from the insurance course without a license left her unemployed, and, as a result, she was evicted from her apartment, so she arranged for child to live with father and his new girlfriend. The stay with father ended when mother attempted to pick up child and father refused to relinquish her because he objected to the companion that mother had with her at the time. A fight ensued; police were called; grandparents offered to shelter child; and child has lived with them since then. At first, this arrangement was necessary because mother had not established a steady income or a stable living situation; she lived for four days in her car and for a time at the YWCA; later, she shared an apartment with her companion and his friend. Once she found and settled into a full-time job, she moved into a two-bedroom apartment with a small fenced backyard, where she still lives with her son from an earlier marriage.

Meanwhile, grandparents decided they wanted custody of child; that was necessary, they testified, in order to have her health care costs covered by grandparents' insurance policy. In March 1999, they petitioned for custody and for a temporary protective restraining order, alleging, among

other things, that mother was "drug dependent"—an allegation that they subsequently abandoned. They also moved for mother and father to show cause why custody should not be given to grandparents. Father did not respond. Mother hand-wrote a four-page answer. The court, on June 14, 1999, issued an order granting temporary custody to grandparents and allowing mother supervised visitation two days per week for three hours each day.

Between that time and the October 10, 1999, trial, mother regularly visited one day per week, but visited on the second day less regularly because, she testified, visitation ended at noon and she had to travel 53 miles by bus to her job and arrive there by one o'clock. Further, she maintained telephone contact with child, but only infrequently. During the same period, grandparents allowed their son to visit, sometimes without their supervision.

At trial, grandmother testified that she would allow mother unsupervised visitation if mother were to begin to "show the effort there." She hoped that, at some future date, mother and father would mature sufficiently to assume custody. Mother, for her part, testified that she believed grandparents were good and loving caregivers and that she would readily allow grandparents' liberal visitation rights:

"Q: Mrs. Thomas, if the Judge would return your daughter to you what are your feelings about visitation for your children, or at least for [child], with their grandparents?

"A: No problem, you know. You know, they want to—let them be the grandparents, you know. I want to raise her and then be able to take her up on a weekend, you know, and spoil her and have her overnight and bring her home, you know, so we can be ready for the next week, you know. They're the grandparents, they should be there, you know. That's what grandparents are all about is just spoiling their grandchildren not raising them."

Grandparents and mother disagree about the number of visits mother missed and why she missed them and about whether grandmother ever threatened to have state authorities put child in foster care if mother did not assume custody. But most of the historical facts in this case are

undisputed. Further, mother does not deny that grandparents have formed a child-parent relationship, nor do grandparents allege any facts that would indicate mother is unfit: by the time of trial, they had abandoned their drug abuse charge, and they allege no mental problems, abuse, or illegal activity. Undisputed evidence also establishes that mother has an excellent parental relationship with her older son, who is thriving in her custody.

The decision to award custody of child to grandparents appears to derive from grandparents' undisputed testimony that mother did not visit regularly or call frequently, that when she did visit she seemed insufficiently affectionate, that mother did not perform her share of child-raising tasks, that she contributed no money for child's care while child was with grandparents, that she and child had not bonded, that grandparents and child *had* bonded, and that grandparents have more material advantages, stability and maturity than mother. On the other hand, mother offered testimony, mostly uncontradicted, to explain her apparent lapses—for example, that she did not telephone as frequently as she would have liked because she could not afford long distance. Further, some evidence suggests that, although grandparents are loving, generous, stable and credible people, they are less than perfect surrogate parents. For example, they had no qualms about leaving child in the unsupervised care of their son, a violent criminal, while admitting that they once refused to allow a visitation with mother because she indicated that, in grandfather's words, "Mexican people" with whom mother was staying were going to help her take care of child and "we wasn't going to let that happen." Particularly disturbing is grandparents' willingness to sign a formal court document intended to deprive mother of child custody because she was "drug dependent," based on grandmother having found a marijuana pipe in the home mother and father shared and rumors that mother's boyfriend "was quite into drugs."

In sum, under *Troxel* and *Harrington,* ORS 109.119(3)(a) requires us to give "significant weight" to mother's right, deeply embedded in our legal and social traditions, to the care, custody and control of her biological

child. Under that standard, on these facts, and at this time, the state cannot deprive her of custody.

The judgment below awarded custody to grandparents and specified a visitation plan for mother. Our disposition of the custody issue requires modification of the visitation plan as well. Because the trial court is better situated to craft a plan with the cooperation of the parties, we remand for that purpose.

Reversed and remanded.