Argued and submitted January 3; resubmitted en banc July 17, reversed and remanded with instructions October 30, 2002

STATE OF OREGON
and Kristin Mayri Emerson,
*Petitioners,*

*v.*

De'Onn Wardell WOODEN,
*Respondent.*

In the Matter of
Dreydon De'Onn Emerson, a Minor Child.

De'Onn Wardell WOODEN,
*Appellant,*

*v.*

Arthur G. EMERSON
and Jessie R. Emerson,
*Respondents.*

C931973DR and J990097; A111860

57 P3d 583

William R. Long argued the cause for appellant. With him on the briefs was Stoel Rives LLP.

John Chally argued the cause for respondents. With him on the brief were Sandra Hodgson and Bouneff & Chally.

Kathy Graham, *pro se*, filed a brief *amicus curiae*.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, Brewer, and Schuman, Judges.

LANDAU, J.

Schuman, J., dissenting.

**LANDAU, J.**

Father appeals a judgment awarding custody of his child (child) to the child's maternal grandparents (grandparents). He argues that the court erred in applying a "best interest of the child" standard. According to father, recent cases replace that standard with one that requires his interests to be given significant weight, amounting to a rebuttable presumption in his favor. That presumption, he argues, has not been rebutted on the record before the court. He therefore concludes that custody must be awarded to him. Grandparents argue that the court applied the correct test and applied it correctly.

We conclude that father is correct that the "best interest" test no longer applies to custody cases between a legal parent and nonparents. We further conclude that, applying the proper standard, legal custody must be awarded to father, subject to a six-month transition period during which father will continue to have visitation as previously ordered by the trial court.

We review the facts *de novo*. ORS 19.415(3). Child was born on February 10, 1993. His mother, Kristin Emerson, and father never married each other, but father's paternity is not in dispute. Father and mother have not lived together since child was born.

From birth until he was 18 months old, child lived with mother and grandparents in Washington County. During that period, mother worked full time, and grandparents provided substantial amounts of child care. They continued to see child regularly, including weekly sleepovers, after he and mother moved into a nearby apartment, where they stayed for another year until child was two-and-a-half. At that time, mother and child moved to Seattle. A year later they returned to Oregon, where mother later married a man named Stacy Bryant. The marriage became tempestuous, and, as it did, mother and child spent considerable time with grandparents. On January 25, 1999, Bryant murdered mother and then killed himself. Child was just under six.

Father, meanwhile, maintained sporadic contact with mother and child. Although he was with mother during

her pregnancy and at child's birth, mother severed the relationship shortly thereafter. By his own estimate, he visited around 60 times between child's birth and mother's marriage to Bryant; mother, in an affidavit executed during a support dispute before her death, estimated 10 visits. He did not visit at all after mother's marriage. Mother and Bryant opposed any further visitation, and father's church pastor advised him that it would be best to eliminate contact with mother and child. Over the years, father paid approximately $12,000 in child support, roughly two-thirds of his legal obligation.

Father learned of mother's murder from an acquaintance four days after the event, on January 29, 1999. That same day—and without notifying father—grandparents filed an *ex parte* motion for temporary custody of child.[1] Two days later, father and grandparents met after mother's funeral to discuss custody, but they did not reach an agreement. The next day, February 1, 1999, the Washington County Circuit Court granted grandparents' motion. A week later, after an emergency hearing, the court vacated that order, declared child a ward of the court, and continued physical custody with grandparents. A more thorough custody hearing occurred on May 3, 1999. Dr. Furchner, a court-appointed psychologist, testified that child would be well served to stay with grandparents "for a while" pending development of a father-son relationship. Father, while expressing a preference for an immediate change in custody, acknowledged that a delay would be acceptable. The court agreed and extended grandparents' custody, setting a "review hearing" for the following year. For the interim year, the court allowed father parenting time on alternate weekends, alternate Wednesdays, and for two weeks in July 1999.

Throughout the following year, father was faithful in his visitation with child, despite the fact that he had to take public transportation from Vancouver, Washington, to grandparents' home in Washington County. He paid all support obligations, even after having been told by grandparents

---

[1] Grandparents appeared as intervenors in an existing proceeding in Washington County Circuit Court No. C931973DR, involving support enforcement. This case retains the state as a nominal party, but the state has never participated in the custody dispute.

that such payments were not necessary. By the end of that year, child regarded father as his "dad."

The review hearing occurred on June 20, 2000. The record developed at that hearing is very sketchy. Father relied on the testimony of Furchner, who had testified at the May 1999 hearing as a court-appointed neutral. She testified that she had conducted a home visit with father and child and that she found father to be a "[v]ery decent young man," steadily employed, from a stable family, involved with his church, and sensitive to child's needs. She testified that, over the past year, child and father developed a healthy parent-child relationship and that child would be served best by living with father after a transition of six months to one year.

Grandparents offered the testimony of Dr. Moran, child's private therapist, who met with child 10 times over the course of the nine or 10 months following mother's death. Moran did not prepare a custody evaluation and, indeed, expressly declined to make a custody recommendation. He explained that he did not meet with father, visit father's home, or observe father's interactions with child. He nevertheless concluded:

> "I think moving [child] in—like right now, would be devastating and traumatic. I say that because it is just a year ago that he lost his mom, to—and he is now developing a secure base, which was essential for him to be a psychologically healthy person, to create a transition at this juncture is going to effectively restrict his ability to trust, because it won't create a secure base."

The trial court acknowledged "the good motives, exemplary life and efforts" of father, expressed gratitude for the cooperative efforts of all parties, announced that "[t]his is not an easy call," and took the case under advisement. Shortly thereafter, the court ruled in favor of grandparents. The court's opinion recited the following "Conclusions of Law":

> "1.   Pursuant to *Sleeper and Sleeper*, 328 Or 504, 982 P2d 1126 (1999) * * *, in ORS 109.119 cases, the 'best interest of the child' standard applies in resolving custody disputes between a biological parent and non-biological parents. * * *

"2. The best interest of the child analysis strongly favors continuing [child's] custody with [grandparents].

"3. [Child's] continued emotional well being requires that he remain with the [grandparents].

"4. [Child] has a liberty interest in preserving his familial or family-like bonds with [grandparents].

"5. [Father's] biological parentage of [child] standing alongside his just emerging and developing father-son relationship with his child does not equal a supervening right that should override the best interest of this child in remaining with the [grandparents]. [Father] does not have a supervening right that would be violated if custody is granted to the [grandparents]."

The court entered judgment awarding "[f]ull legal and physical custody" to grandparents. The judgment further provides that, "[i]n furtherance of encouraging the continuing development of [father's] and [child's] father-son relationship," father's parenting time was increased to include two more weeks in summers, five days at Christmas, alternating Thanksgivings, alternating spring vacations, Father's Day, and father's birthday. Father appeals.

To resolve this case, we must understand the interplay between decisions of this court, the Oregon Supreme Court, the United States Supreme Court, and ORS 109.119 (1997).[2] As relevant to this case, that statute provided:

"(1) Any person * * * who has established emotional ties creating a child-parent relationship or an ongoing personal relationship with a child, or any legal grandparent may petition or file a motion for intervention with the court having jurisdiction over the custody, placement, guardianship or wardship of that child * * *.

---

[2] In 2001, the Legislative Assembly amended ORS 109.119. The amendments "apply to petitions filed under ORS 109.119 or 109.121 (1999 Edition) before, on or after the effective date of this 2001 Act [July 31, 2001]." Or Laws 2001, ch 873, § 3, compiled as a note after ORS 109.119 (2001). In Williamson v. Hunt, 183 Or App 339, 343, 51 P3d 694 (2002), we held that the amendments apply to petitions filed under the 1999 version of ORS 109.119 and ORS 109.121. This case was filed before the 1999 version of ORS 109.119 took effect. Therefore, the 2001 amendments do not apply, and references throughout this opinion are to the 1997 version of the applicable statutes.

"(2)(a)   If the court determines that a child-parent relationship exists and if the court determines by a preponderance of the evidence that custody, guardianship, right of visitation, or other generally recognized right of a parent or person in loco parentis, is appropriate in the case, the court shall grant such custody, guardianship, right of visitation or other right to the person, if to do so is in the best interest of the child. The court may determine temporary custody of the child or temporary visitation rights under this paragraph pending a final order."

In *Sleeper*, the Supreme Court held that the statute

"requires the court to examine the circumstances surrounding the custody dispute and to determine whether the best interests of the child call for an award of custody to the nonbiological parent. If the best interests of the child call for custody to the nonbiological parent, then the court must make such award, unless to do so would violate some supervening right belonging to the biological parent."

328 Or at 511. The Supreme Court did not explain what a "supervening right" might be or the extent to which the *Sleeper* "best interest subject to supervening right" analysis differs from the earlier "parental presumption subject to compelling interest" analysis.

Meanwhile, in *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), a majority of the justices of the United States Supreme Court agreed that the Due Process Clause of the Fourteenth Amendment of the United States Constitution protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." 530 US at 66.[3] The same justices agreed that, under the circumstances of that case, the state court's decision to override the biological parent's reasonable choice to limit visitation merely because that visitation was "in the best interest of the children" impermissibly infringed on that fundamental right. *Id.* at 68-70.

---

[3] Justice O'Connor expressed that conclusion in a plurality opinion that was supported by three other justices. Justices Thomas and Souter agreed that the Court's case law recognized the fundamental right that Justice O'Connor had described, but each advocated a different way of resolving the particular issues at hand.

In *Harrington v. Daum*, 172 Or App 188, 18 P3d 456 (2001), a visitation case, we addressed the impact of *Troxel* on the analysis that the Oregon Supreme Court articulated in *Sleeper*. We held:

> "*Troxel* * * * give[s] new significance to the Supreme Court's reference in *Sleeper* to a supervening right of the parent that changes how the statute would otherwise function. Under *Troxel*, the parent's right to make decisions concerning the child's upbringing is such a supervening right. The result is to change the analysis to one that is closer to what we discussed in *Shofner* [*v. Shofner*, 137 Or App 543, 905 P2d 268 (1995), *rev den*, 322 Or 644 (1996)]. As we noted in that case, the statute requires proof that it is appropriate to award visitation to a person before a court may consider whether the best interests of the child justify such an award. In addition, we recognized the parent's right to uninterrupted custody as one of the things that a court should consider. *Troxel* now establishes that the court must give significant weight to a fit custodial parent's decision. That constitutional right is a supervening right that both affects the determination of whether visitation is appropriate and prevents the application of solely a 'best interests of the child' analysis."

*Harrington*, 172 Or App at 197-98 (footnote omitted). In *Newton v. Thomas*, 177 Or App 670, 673-74 33 P3d 1056 (2001), we held that that language applies with equal force to custody disputes.

More recently, in *Wilson and Wilson*, 184 Or App 212, 218-19, 55 P3d 1106 (2002), we summarized the effect of *Troxel* and subsequent cases in the following terms:

> "*Troxel, Harrington,* and *Newton,* then, alter the interpretation of ORS 109.119 in *Sleeper*. Instead of basing custody or visitation decisions on a 'best interest of the child subject to supervening parental right' analysis, we now give 'significant weight' in that calculus to a fit biological parent's fundamental right to determine the care, custody, and control of his or her children. As the *Troxel* plurality phrased that idea, we give force to 'the traditional presumption that a fit parent will act in the best interest of his or her child.' *Troxel*, 530 US at 69. * * * Thus, a fit biological parent's right is 'supervening' not in the sense that it always and necessarily 'supervenes' or trumps the outcome of a

pure 'best interest of the child' inquiry, but in the sense that the right 'supervenes' the pure 'best interest' analysis itself, replacing it with one in which a fit biological parent will presumptively prevail over a nonparent unless the nonparent presents compelling reasons to overcome that presumption, for example by showing that a ruling in favor of the biological parent will harm the child."

In this case, the trial court found that grandparents cleared the first barrier in their quest for custody: They demonstrated that they had a child-parent relationship with child. ORS 109.119(2)(a). Father does not dispute that finding. The trial court then explicitly applied the pre-*Troxel* test as described in *Sleeper* and found in favor of grandparents. Father now argues that using the older test was error. In light of subsequent developments, in particular our opinions in *Harrington* and *Newton*, father asserts that the court should have given "significant weight" to his fundamental right to make decisions regarding the care, custody, and control of his child without undue interference from the state. Had it done so, father argues, he would have prevailed.

Before determining whether father should prevail under a post-*Troxel* analysis, however, we must first determine whether he possesses the fundamental right that case describes. Grandparents contend that he does not; that right, they contend, does not inhere in a fit parent on the basis of a merely biological connection to the child. More is required. By his failure to participate directly and significantly in the first six years of child's upbringing, they argue, father has in essence waived his parental rights. Because the parents in *Harrington* and *Newton* were active, direct participants in the upbringing of their children, we have not yet addressed what level of nonparticipation might divest a biological parent of the "supervening right" at issue in ORS 109.119.

■     Father's parental right, if he has it, derives from the Due Process Clause of the Fourteenth Amendment. *Harrington*, 172 Or App at 198 ("supervening right" is the one identified in *Troxel, i.e.*, a substantive right under Due Process Clause). In determining the contours of that amendment and the rights it confers, we look to the decisions of the United States Supreme Court. *Megdal v. Board of Dental*

*Examiners*, 288 Or 293, 300, 605 P2d 273 (1980). Those decisions indicate that a biological connection, by itself, does not automatically confer parental rights, but that mere physical absence, by itself, does not automatically waive them.

2.      Language in some cases does suggest that parental rights derive automatically from biology. For example, in *Santosky v. Kramer*, 455 US 745, 753, 102 S Ct 1388, 71 L Ed 2d 599 (1982), the Court stated:

> "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life."

As in *Santosky*, the parental right is often described as a right to, among other things, the "care" and "custody" of children. *Troxel*, 530 US at 66; *Stanley v. Illinois*, 405 US 645, 651, 92 S Ct 1208, 31 L Ed 2d 551 (1972). Likewise, the right has been described as the right to "establish a home and bring up children," *Meyer v. Nebraska*, 262 US 390, 399, 43 S Ct 625, 67 L Ed 1042 (1923), and to the "companionship" of one's own children, *Stanley*, 405 US at 651. From one perspective, and in isolation, those phrases all suggest that the right to a custodial relationship with one's children is inherent in biological parenthood itself.

None of those cases deals with the rights *vel non* of a parent who has not participated directly and significantly in his child's upbringing, however. The parents in *Santosky*, maintaining that the state could not terminate their parental rights based merely on a "fair preponderance of the evidence," had raised their children and were not voluntary nonparticipants. 455 US at 751. The biological father in *Stanley* had lived with the mother intermittently for 18 years, 405 US at 646, and the children were ones that he had "sired and raised," *id.* at 651. *Meyer* involved the rights of custodial natural parents to direct the education of their children. 262 US at 400. In *Smith v. Organization of Foster Families*, 431 US 816, 823-25, 97 S Ct 2094, 53 L Ed 2d 14 (1977), the Court

recognized that biological parents who voluntarily relinquished their children to foster parents retained some parental rights, but it also emphasized that the relinquishment was temporary, that the natural parents were required by law to visit their children, and that the relinquishment was "voluntary" in name only; in reality, it was compelled by parents' poverty or physical or mental illness.

■ In sum, all of the cases containing language that might be taken to imply that parental rights derive from a mere biological connection actually imply nothing of the sort. They do not stand for the proposition that the state must grant the opportunity to exercise care, custody, and control to those who have not participated directly and significantly in the upbringing of their children. Rather, they establish that parents who have, or once had, care, custody, and control of their children may not be deprived of those benefits by the state without due process of law.

In fact, when the cases deal with nonparticipating or minimally participating biological parents, they expressly announce that parental rights are *not* biologically based. The leading case is *Lehr v. Robertson*, 463 US 248, 103 S Ct 2985, 77 L Ed 2d 614 (1983), in which the Court had to determine whether a father had parental rights with respect to "a child whom he has never supported and rarely seen in the two years since her birth." *Id.* at 249-50. Emphasizing the "linkage between parental duty and parental right," *id.* at 257, the Court quoted with approval a dissenting opinion of Justice Stewart: " 'Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.' " *Id.* at 260 (quoting *Caban v. Mohammed*, 441 US 380, 397, 99 S Ct 1760, 60 L Ed 2d 297 (1979) (Stewart, J., dissenting)). The Court noted "the clear distinction between a mere biological relationship and an actual relationship of parental responsibility," *Lehr*, 463 US at 259-60, and continued:

> "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship * * *. If he fails to do so,

the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie."

*Id.* at 262. That result echoed and was based in part on *Quilloin v. Walcott*, 434 US 246, 98 S Ct 549, 54 L Ed 2d 511 (1978), where the Court held that a father had no constitutional right to object to the termination of his parental rights on a mere "best interest of the child" standard where the father never had custody of his biological 11-year-old son, never lived with him, and supported him only irregularly.

We have followed the reasoning of those cases. In *P and P v. Children's Services Division*, 66 Or App 66, 71, 673 P2d 864 (1983), we held that the Due Process Clause does not entitle a nonparticipating father to notice before termination of his parental rights because he had not "demonstrate[d] a commitment to the responsibilities of parenthood." In *McIntyre v. Crouch*, 98 Or App 462, 780 P2d 239, *rev den*, 308 Or 593 (1989), *cert den*, 495 US 905 (1990), a semen donor contended that the filiation statute, by denying him standing to initiate filiation proceedings, violated his parental rights under the Due Process Clause. The donor asserted that he wanted to "remain active" in the child's life, "participate in all important decisions concerning the child," and visit regularly. *Id.* at 464. Reversing the trial court's summary judgment against the donor, and citing *Lehr*, we agreed that the statute would violate the Due Process Clause if the donor could establish that he and the mother had agreed that he would assume the responsibilities of fatherhood. *McIntyre*, 98 Or App at 471. By negative implication, we accepted *Lehr*'s holding that a biological connection, without more, would not create parental rights.

■ We therefore conclude that, under controlling United States Supreme Court precedent and consistently with our own cases, father cannot avail himself of the "supervening right" to a privileged position in the decision whether to grant custody of child to grandparents merely because he is child's biological father. That conclusion, however, does not end our inquiry; as we noted in *McIntyre*, *Lehr* teaches that, while a biological father does not have parental rights automatically and for that reason only, even a relatively

uninvolved parent may, by virtue of his conduct, avoid losing them. *Lehr* speaks of the father's opportunity to "develop a relationship with his offspring" and declares that he may be entitled to assert parental rights "[i]f he grasps that opportunity and accepts some measure of responsibility for the child's future." 463 US at 262. We must now determine whether father has done so.

■     We conclude that he has. There is some force to the argument that he has done so merely by virtue of acknowledging paternity; that act alone distinguishes him from the putative parents in *Lehr, Quilloin, McIntyre,* and other cases demonstrating the insufficiency of a merely biological connection. We need not decide that question here, however, because father has done much more. In reaching that conclusion, we do not underestimate the importance of the fact that, before mother's death, father visited only sporadically and fell behind in his child support payments. But we also note, in mitigation, that father did not desert mother and child, she chose to leave him; that he did maintain some contact and paid two-thirds of his support obligation; that, for part of child's life, he and child were separated by geography, with child in Seattle (father does not drive); that father's pastor advised him that his mental health would be best served by limiting or eliminating contact with mother and child; and that, for the year immediately before mother's death, father stopped all visitation because mother and her violence-prone husband told him to stay away.

Most significantly, we note father's conduct after mother's murder. He came forward to discuss child's future within 48 hours of learning that mother and her husband were dead. Since that time, he has paid all support obligations, even after learning from grandparents that they did not want or need payment. He has also maintained a near-perfect record of regular visitation, despite the fact that he has to take public transportation from Vancouver, Washington, to grandparents' home in Washington County. Within the terms of the visitation schedule imposed by the court (and with the full cooperation of grandparents), he has taken every possible step to make himself an important presence in child's life. According to the uncontradicted evidence, he has succeeded. At the time of the first full hearing, in May

1999, father was more or less a stranger to child, unbonded and barely recognized; by the June 2000 hearing, he had developed a substantial father-son relationship. We therefore conclude that father has parental rights that must be given significant weight in determining whether he or grandparents should have custody.

Our conclusion that father has parental rights under the facts of this case does not end our inquiry. Father's rights create a rebuttable presumption, and we must now determine whether grandparents have rebutted it. In doing so, we take some guidance from *Hruby and Hruby*, 304 Or 500, 748 P2d 57 (1987), which governed custody disputes between biological parents and qualifying nonparents before *Sleeper* and established a standard not unlike the one we have adopted in response to *Troxel*.[4] In *Hruby*, after a thorough review of Oregon custody cases involving parents and nonparents, the court concluded:

> "[A] natural parent has the right to the custody of his or her children, absent a compelling reason for placing the children in the custody of another; the 'best interests of the child' standard applicable to custody disputes between natural parents in a marriage dissolution proceeding is not applicable to custody disputes between natural parents and other persons."

*Hruby*, 304 Or at 510. The court noted expressly that nonparents could establish compelling reasons to obtain custody without proving that the parent was unfit. Rather, the proper inquiry was whether custody with the parent would be " 'highly detrimental' to the child's welfare, regardless of the parent's fitness," *id.* at 508; whether custody with the nonparent was necessary "to protect the children from some compelling threat to their present or future well-being," *id.* at 509; and whether there was "good cause" or "cogent" reasons, to place the child with the nonparent, *id.* at 510. Summarizing, the court explained:

---

[4] In *Harrington*, 172 Or App at 197-98, we noted that *Troxel* modified the interpretation of ORS 109.119 by moving it in the direction of *Shofner*. In *Shofner*, 137 Or App at 548-49, in turn, we indicated that *Hruby* set the appropriate standards for custody cases. Thus, *Hruby* provides guidance here.

"We use 'compelling' to emphasize that in a custody dispute between a natural parent and some other person, a court should not be concerned with attempting to maximize a child's welfare, but with determining whether the child will receive adequate care and love from its natural parent and whether the child will be otherwise unduly harmed, physically or psychologically, by giving custody to the natural parent."

*Id.* at 511. Applying that standard, the court concluded that the child's aunt had not presented sufficiently compelling reasons to acquire custody:

"The child has an emotional attachment to the father and wishes to be with him (though also with the aunt). In addition, the child stayed at the father's home in San Diego for six weeks without experiencing any apparent psychological or emotional difficulties. Given these facts * * *, we conclude that there is no compelling reason to deny custody to the father. There has been no showing that the child would not receive adequate care and love from the father or that the child would be otherwise unduly harmed, physically or psychologically, by giving custody to him."

*Id.* at 517-18. *See also Fenimore v. Smith*, 145 Or App 501, 509-11, 930 P2d 892 (1996), *rev den*, 326 Or 389 (1998) (applying *Hruby*; stepfather of adolescent daughter who has suffered "traumatic loss" overcame parental presumption because removing her from stepfather's house would cause "undue psychological harm" despite natural parent's fitness); *Cerda and Cerda*, 136 Or App 104, 109, 901 P2d 263 (1995), *rev den*, 322 Or 598 (1996) (applying *Hruby*; father's uncontrolled anger and abusive behavior constitute compelling reasons to place children with grandparents).

■■ Thus, to overcome the presumption in favor of father, grandparents must establish by a preponderance of the evidence, ORS 109.119(2)(a), that father cannot or will not provide adequate love and care for child or that moving child to father's custody would cause child undue physical or psychological harm. The record in this case contains no indication whatsoever, nor do grandparents argue, that father would be deficient as a provider of love and care or that placement with him would cause physical harm; indeed, grandparents and

the court have nothing but praise for father's character, current devotion to child, and parenting skills. The sole criterion in contention is psychological harm.

Relying on Moran's testimony, grandparents argue that awarding custody to father would be "devastating and traumatic" to child. That is not precisely what Moran said, however. Moran, it must be recalled, did not offer a recommendation concerning custody. He expressly declined to do that. He provided no testimony about the conduct of the parties, their relative fitness to provide support for child, the comparative physical environments in which child would live, child's emotional ties to other family members, the interests of the parties, or their attitudes towards child; in short, he provided no testimony about the usual considerations that go into a custody evaluation. Instead, he offered an opinion—based solely on his limited contact with child—on the narrow issue of the probable effect of awarding custody "right now." Moran said nothing about Furchner's recommendation that custody be awarded to father with a transition period of between six and 12 months. Indeed, grandparents offered no evidence at all to contradict Furchner's opinion that a gradual transition to father's full custody would not cause psychological harm to child.

Given the state of the record, we cannot but conclude that grandparents have not rebutted the significant presumption in favor of father's custody of child. At best, they have established that, "right now," it would be stressful to change custody, because of the recency of the mother's death. But we are not confronted with an "immediate-or-nothing" proposition. Furchner testified persuasively that child would not be harmed by a gradual transition to father's custody, and there is no evidence in the record to the contrary.

This is not an easy case. We are required to determine the rights of parties of unquestioned good will, good character, and admirable devotion to the welfare of child in an area of the law that is, at best, a work in progress. Nonetheless, cases require resolution in accordance with the law as we understand it and on the basis of the record that the parties have made. We understand the law to create a presumption in favor of a natural parent's custody, which may

be rebutted by a showing that the natural parent will not provide adequate love and care for the child or that moving the child to the natural parent's custody will cause undue physical or psychological harm. In this case, grandparents simply have not made a record sufficient to overcome that presumption.

We therefore conclude that the trial court erred in awarding custody to grandparents. Father is entitled to custody of child, following a six-month transition period during which the visitation schedule ordered by the trial court will remain in effect.

Reversed and remanded for entry of judgment awarding custody of child to father, subject to six-month transition period during which previously ordered visitation schedule remains in effect, beginning on date of issuance of this opinion.

**SCHUMAN, J.,** dissenting.

I agree with everything in the majority's opinion in this difficult case except the outcome. To be more specific: I agree that under Oregon statutory and case law as interpreted in light of *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), we must give significant weight to a fit biological parent's fundamental right to determine the care, custody, and control of his or her children, and, as a consequence, the state may not award custody of a child to a nonparent instead of the child's fit biological parent, contrary to the wishes of the fit biological parent, unless the nonparent has overcome a powerful presumption in favor of the fit biological parent. I also agree that a fit biological parent does not possess the fundamental right to the care, custody, and control of his or her child by virtue of biology alone; rather, he or she must have participated to some degree in the child's rearing. I agree that the presumption in favor of the parent who has done so is rebutted only if the nonparent can demonstrate that the biological parent cannot or will not provide adequate love and care for the child or that giving custody of the child to the parent will cause the child undue physical or psychological harm. Finally, on the facts of this case, I agree that father has participated in the rearing of child to such a degree that he qualifies for the presumption in favor of a fit

biological parent, that he is willing and able to provide adequate love and care for child, and that moving child to father's custody will not cause child undue physical harm.

Thus, the majority and I part company only on the issue of psychological harm. Relying on the same record, I reach a contrary conclusion: I believe moving child from grandparents' custody to father's will cause undue psychological harm. Because this is necessarily a fact-specific determination and the particular facts of this case are unlikely to recur, it would serve no purpose to recite the reasons why I disagree with the majority. Further, such a recital could adversely affect the parties. Suffice it to say that I respectfully dissent.

Deits, C. J., and Brewer, J., join in this dissent.