Submitted on record and briefs October 4, 2002, affirmed January 15, 2003

In the Matter of the Marriage of

Donald Walter AUSTIN,
*Respondent,*
*and*

Rebecca Anne AUSTIN,
*Appellant.*

00P-2049; A113121

62 P3d 413

Rebecca Anne Austin filed the briefs *pro se*.

Howard W. Collins filed the brief for respondent.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

BREWER, J.

**BREWER, J.**

In the judgment dissolving the parties' marriage, the trial court awarded custody of three children to father. The two younger children are the parties' sons. The oldest child is mother's son from a previous relationship, whose custody the trial court awarded to father under ORS 109.119 (1999). Mother appeals from the custody and parenting-time awards, arguing that the trial court erred in awarding custody of the oldest child to father and in providing inadequate parenting time for her with the younger children. We review those decisions *de novo*, ORS 19.415(3), and affirm.

The parties were married in 1995. At the time of the marriage, mother's oldest child, Stephen, was three years old. Stephen's biological father played no role in Stephen's life during the course of the marriage. Two children were born of the parties' marriage, Donald and Theodore, in 1996 and 1997, respectively. The parties separated in February 2000. Father was awarded temporary custody of all three children after a hearing held in March 2000. Mother then moved out of the family home.

The following evidence was adduced at trial in August 2000. Mother suffers from a disability arising from medical conditions that have required several brain surgeries. The disability causes mother to easily become tired, to lose her balance, and to suffer memory loss. Mother complained to several witnesses, including an in-home counselor, Christine Pahl, that she was overwhelmed by the responsibilities of parenting. She told a neighbor that the children should be split up, with father receiving custody of the younger boys and Stephen residing with her. The evidence showed that the children are very close to each other. Three of the parties' neighbors testified that they were concerned for the safety of the children in mother's care because the parties' home was dirty and food, dirty diapers, and curdled milk were often left on the floor. One neighbor testified that mother did not have "the energy, the desire, or just be able to make the self-sacrifice that it takes to take care of kids."

The evidence also showed that mother inadequately supervised the children, including their outside play, so as to

expose them to physical danger. For example, one of the witnesses testified that

> "[t]he kids are very small; we live in a very busy road. They were out a lot unattended. They were often not clothed appropriately for the weather. And they seemed to be not on any kind of feeding schedule, they didn't seem to be fed at any regular interval."

Another witness testified that

> "you'd see a child, only so tall, you know, standing in the street.
>
> "And with the way cars would whip into our cul-de-sac and come along the highway, they wouldn't see a child until it was too late.
>
> "And I would—you'd just get uptight looking at it. So the lack of supervision really bothered me.
>
> "Having been inside the home, the conditions were, were ones that you wouldn't imagine people would be living in. * * *
>
> "There was lack of sanitation, lack of proper care, things that just * * * you felt someone should step in and do something about."

After mother moved from the family home in March 2000, father, with the help of a nanny, maintained the home in an organized, safe, and clean condition. Although mother had told her that father was a controlling person, Pahl testified that she found him to be a consistent, capable parent. He has been active in the lives of all three children and has been the only father figure that Stephen has known. According to one of the neighbors, Stephen, who had previously experienced anger control problems, became calmer and better adjusted after the temporary custody hearing.

Mother also called a number of witnesses, including family members, another in-home counselor and a Services to Children and Families (SCF) caseworker. The caseworker testified that SCF had investigated a complaint of neglect involving the parties' children and had determined that it was not well founded. The counselor, Lisa Bitikofer, preceded Pahl as mother's in-home counselor. She testified generally that mother had sought various support services, had

improved her household management, and that she was a loving parent. However, Bitikofer had refused to meet with father. Mother's family members also testified that they believed mother was a good parent. The family members testified that mother could move with the children to Washington and receive assistance from them. In addition, a nurse practitioner testified that mother's physical condition was only mildly disabling.

In awarding custody of all three children to father, the trial court found that mother was well intentioned but that "[l]ife raising three boys is too overwhelming for [mother] and will continue to be overwhelming for too long of a time. She cannot remain focused for the long-term." The court explained its assessment of the evidence:

> "Pursuant to a temporary decision all three boys have been living with their father in the marital home * * *. The home is 1,500 square feet and located on the corner of a cul-de-sac and a busy city thoroughfare.

> "Three of four witnesses whose opinion is that it would be in the best interests of the children to remain with their father were neighbors of the Austin household. Each of the three were more acquainted with [mother]. Each testified about the constant squalor and their concerns for the safety of the boys inside and outside the home. Each testified to seeing the boys outside the home without supervision while in the vicinity of a busy street. Each testified favorably as to the changes to the [boys'] physical environment as well as their physical and mental well being since custody of the children was awarded to [father] and [mother] moved out. Each was adamant that it would be in the best interests of the children to live with [father].

> "[Mother's] support comes from her family. They also testified to the bucolic environment awaiting the children in rural Washington. To sanction that situation is to 'gut' a meaningful parenting time for the children and their father.

> "[Bitikofer], from Options [Counseling Services] also testified in favor of [mother]. She is certainly not unbiased. Her view of this family is shaped by her discussions with [mother]. She refused to meet with [father]. Her employer then brought in Christine Pahl who had heard of this family

from briefings at Options. She testified to having precon-
ceived views of [father], which quickly dissipated after
meeting him. In fact, she testified on his behalf."

With specific reference to Stephen, the court also stated, "The
opinions of the three neighbors and that of [the counselor]
together with their manner of testifying and their explana-
tion for their opinions by far counters the assumption that
Stephen be with his biological parent."

When this case was tried, ORS 109.119 (1999) was in
effect. That statute provided, in part, that a "stepparent
* * * who has established emotional ties creating a child-
parent relationship" could file a petition for custody of a step-
child. ORS 109.119(1) (1999). It also provided that, if the
court found that such a relationship existed and determined,
by a preponderance of the evidence, that a custody award to
the stepparent was in the child's best interest, it could make
such an award. ORS 109.119(3)(a) (1999). For present pur-
poses, the 1999 version of the statute is identical to the 1997
version. In *Sleeper and Sleeper*, 328 Or 504, 511, 982 P2d
1126 (1999), the Supreme Court held that the 1997 version of
the statute

"requires the court to examine the circumstances surround-
ing the custody dispute and to determine whether the best
interests of the child call for an award of custody to the non-
biological parent. If the best interests of the child call for
custody to the nonbiological parent, then the court must
make such award, unless to do so would violate some super-
vening right belonging to the biological parent."

In June 2000, the United States Supreme Court
decided *Troxel v. Granville*, 530 US 57, 66, 120 S Ct 2054, 147
L Ed 2d 49 (2000), where a majority of the court agreed that
the fundamental right of a natural parent to determine the
care, custody, and control of his or her children is entitled to
"significant weight" in the calculus of child custody decisions.
We have held that *Troxel* altered the court's interpretation in
*Sleeper* of ORS 109.119 (1997). In *Wilson and Wilson*, 184 Or
App 212, 218-19, 55 P3d 1106 (2002), we explained:

"Instead of basing custody * * * decisions on a 'best interest
of the child subject to supervening parental right' analysis,

we now give 'significant weight' in that calculus to a fit biological parent's fundamental right to determine the care, custody, and control of his or her children."

After *Troxel* was decided, the 2001 Oregon Legislature amended ORS 109.119. The 2001 amendments apply retroactively to petitions filed under the 1999 version of ORS 109.119, including the petition in this case. Or Laws 2001, ch 873, § 3, *compiled as a note after* ORS 109.119 (2001); *Williamson v. Hunt*, 183 Or App 339, 343, 51 P3d 694 (2002).

ORS 109.119 (2001) provides, in part:

"(2)(a)   In any proceeding under this section, there is a presumption that the legal parent acts in the best interest of the child.

"(b)   In an order granting relief under this section, the court shall include findings of fact supporting the rebuttal of the presumption described in paragraph (a) of this subsection.

"* * * * *

"(3)(a)   If the court determines that a child-parent relationship exists and if the court determines that the presumption described in subsection (2)(a) of this section has been rebutted by a preponderance of the evidence, the court shall grant custody * * * to the person having the child-parent relationship, if to do so is in the best interest of the child.

"* * * * *

"(4)(a)   * * *

"(b)   In deciding whether the presumption described in subsection (2)(a) of this section has been rebutted and whether to award custody * * * over the objection of the legal parent, the court may consider factors including, but not limited to, the following, which may be shown by the evidence:

"(A)   The legal parent is unwilling or unable to care adequately for the child;

"(B)   The petitioner or intervenor is or recently has been the child's primary caretaker;

"(C) Circumstances detrimental to the child exist if relief is denied;

"(D) The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or

"(E) The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor.

"* * * * *

"(8) As used in this section:

"* * * * *

"(b) 'Circumstances detrimental to the child' includes but is not limited to circumstances that may cause psychological, emotional or physical harm to a child."

ORS 109.119 (2001) made two critical changes to the substance of the previous version of the statute. First, it established a "presumption that the legal parent acts in the best interest of the child." ORS 109.119(2)(a) (2001). That provision focuses on the quality of the legal parent's conduct with respect to matters affecting the child's best interest. Second, the legislature created a nonexclusive list of factors that are relevant to the determination of whether the presumption that a legal parent has acted in the child's best interest has been rebutted. ORS 109.119 (4)(a), (4)(b) (2001).[1]

We turn to the application of ORS 109.119 (2001) to the facts at hand. Mother does not dispute that father has a child-parent relationship with Stephen. ORS 109.119(1) (2001). The question, rather, is whether father has rebutted the presumption that mother acts in Stephen's best interest. ORS 109.119(2)(a) (2001). In this case, the most important statutory factors are those listed in subsections (4)(b)(A) and (4)(b)(C). Those factors support the determination that custody of Stephen should be awarded to father. Although mother clearly loves Stephen, the preponderance of the credible evidence, especially the testimony of the neighbors and

---

[1] Mother does not contend that the 2001 version of the statute is inconsistent with the constitutional requirements imposed by *Troxel*. Accordingly, we do not consider that issue.

Pahl, shows that mother has been and will be unable to adequately care for Stephen and that, as a result, his physical well-being has been jeopardized.

However, that evidence does not stand alone. The factors listed in ORS 109.119(4)(b) (2001) are nonexclusive. In addition, we consider the harm that would be caused to Stephen if he were separated from his siblings. *Spurgeon and Spurgeon*, 119 Or App 59, 63, 849 P2d 1132 (1993); *Moe and Moe*, 66 Or App 947, 951, 676 P2d 336 (1984). Mother has not appealed from the trial court's award of custody of the two younger children to father. The evidence is compelling that the children are very close and enjoy each other's regular companionship. Because mother's proposed custody disposition is inconsistent with the nurturance of Stephen's relationship with his siblings, that factor also supports rebuttal of the statutory presumption.

We conclude that father has overcome the presumption that mother, as a legal parent, will act in the best interest of Stephen if his custody is awarded to her. The trial court therefore did not err in awarding custody of all three children to father.[2]

Affirmed.

---

[2] We reject without discussion mother's argument that the trial court erred in setting her parenting-time schedule with the children.