Debra JONES *v.* Ross JONES and Glenda JONES

CA 84-259                                    680 S.W.2d 118

Court of Appeals of Arkansas
Division I
Opinion delivered December 5, 1984

*East Arkansas Legal Services, Inc.,* by: *James O'Conner,* for appellant.

*Henry & Mooney,* by: *John R. Henry,* for appellees.

GEORGE K. CRACRAFT, Chief Judge. Debra Jones appeals from an order of the chancery court awarding custody of her minor son to Ross and Glenda Jones. Appellant was divorced from her husband in 1979 and was awarded custody of the minor by that decree. Appellees are the minor's aunt and uncle in whose custody the minor had subsequently been placed by the juvenile court. While the case was pending in juvenile court appellees filed this action in the chancery court seeking custody of the child. This case was not heard until after the juvenile court proceedings were dismissed. Appellant contends that the chancery court lacked subject matter jurisdiction and that the court erred in removing custody from appellant.

The appellant first contends that the trial court was without subject matter jurisdiction. The complaint of the appellees alleged that the appellant was not a proper person to have custody of the minor and the best interest of the child required that he be placed in appellees' custody. By subsequent amendment appellees alleged that the minor had originally been placed in their custody by an order of the juvenile court which was later abated. They further alleged that the minor had been beaten and abused while in appellant's custody and if returned to her home would be subjected to further abuse, and that the child's condition had improved while in their care and custody and that he should remain there. The appellant contends that these allegations in effect maintain that the minor is a "dependant-neglected

child" within the meaning of Ark. Stat. Ann. § 45-403(4) (Repl. 1977) and that "original and exclusive jurisdiction" of such cases is vested in the juvenile court under § 45-406(a)(Supp. 1983). We find no merit to this contention.

It has long been settled that minors are wards of the chancery court and it is the duty of those courts to make all orders that will properly safeguard their rights, including the awarding of their custody to persons other than natural parents if circumstances warrant. *Richards* v. *Taylor*, 202 Ark. 183, 150 S.W.2d 32 (1941); *Kirk* v. *Jones*, 178 Ark. 583, 12 S.W.2d 879 (1928); *State* v. *Grisby & Wife*, 38 Ark. 406 (1882). The enactment of the Arkansas Juvenile Code of 1975 in no way interferes with that jurisdiction. The purpose of the juvenile code was to empower the State in its public guardianship capacity to act in emergency situations involving the safety and welfare of dependent, neglected and abused minors and to designate the forum in which determinations of the necessity of temporarily placing those minors under the care of the State is to be made. The juvenile court has special jurisdiction to temporarily protect minors in emergency situations.

The chancery courts retain general jurisdiction over the persons and the properties of minors. *Robins* v. *Ark. Social Services*, 273 Ark. 241, 617 S.W.2d 857 (1981); *Ex Parte King*, 141 Ark. 213, 217 S.W. 465 (1919). Both cases carefully point out that the juvenile courts are to exercise special subject matter jurisdiction solely on the basis of the State's public guardianship over minors as a class and that the constitutionally created courts retain all of their traditional jurisdiction over individual minors.

In *Ex Parte King*, the court in discussing the constitutionality of an earlier Juvenile Act vesting jurisdiction in the county court stated:

> In reaching this conclusion, we are not unmindful of the jurisdiction conferred by the Constitution upon courts of chancery, which is the same jurisdiction that courts of equity exercise at the time of the adoption of the Constitution. Art. 7, § 15, Const. Courts of equity at

the time of the adoption of our Constitution had general jurisdiction over the persons and property of minors. *Bowles* v. *Dixon,* 32 Ark. 92; *Myrick* v. *Jacks,* 33 Ark. 425; *State* v. *Grisby and Wife,* 38 Ark. 406; *Watson* v. *Henderson,* 98 Ark. 63.

In the last case we said: "But it was not intended by the Constitution to take away from the chancery courts their ancient original jurisdiction over the persons and estates of minors so far as such jurisdiction may be necessary for the protection of the infant or to protect his property from waste or spoliation through the carelessness, fraud, mistake or imposition of his parents, guardians, or others. These are distinct grounds of equitable jurisdiction which have existed since the establishment of courts of chancery, and have been recognized in the jurisprudence of our English-speaking people for centuries."

. . .This jurisdiction of chancery courts, as the jurisdiction of probate courts in matters relating to guardians, deals solely with the person and the estate of the *individual* infant and has reference to the interests of the particular individual rather than to a *class.* It deals with matters of private guardianship and not with that public guardianship over infants as a class, such as was contemplated by the framers of the Constitution by the jurisdiction conferred upon county courts, as *parens patriae,* to assume custody and control over infants as wards of the State whenever their condition, or their conduct, makes it necessary that this should be done for the public welfare. [Emphasis supplied]

In *Robins* the court, in discussing the present Juvenile Code, cited *Ex Parte King* with approval and declared:

Juvenile court has no jurisdiction to hear custody cases between private litigants. Juvenile courts hear cases involving temporary care of infants as wards of the State, while chancery courts hear custody cases between private litigants.

The appellees' complaint in the chancery court did not purport to provide for temporary care of a minor who was neglected or abused in his present whereabouts. That had already been done by the State over a year earlier in the juvenile court which placed the child in appellees' care. This action was brought to obtain legal and parental custody of a minor already in appellees' physical custody on allegation that his natural parent was unfit and that it would be in the minor's best interest that he remain there. It is also noted that when appellees attempted to intervene in the juvenile proceedings and present evidence of appellant's unfitness, appellant moved to dismiss the action "because it involves a dispute between two private parties and is thereby beyond the jurisdiction of juvenile court," citing *Robins.* The juvenile court granted that motion.

The appellant next contends that the chancellor based his determination solely on the superior ability of appellees to attend to the material needs of the child and ignored the rule that as between the parents and strangers the law prefers the former even though the latter may be more affluent. She argues that the evidence would not sustain a finding that she was guilty of immoral conduct or had failed to properly support the child in accordance with her abilities and that her right to custody should have taken preference even though his condition in life was materially improved while in the appellees' care.

We agree that the State should not interfere with a parental right simply to better the temporal welfare of the child as against an unoffending parent. *Woodson* v. *Lee,* 221 Ark. 517, 254 S.W.2d 326 (1953); *French* v. *Graves,* 205 Ark. 409, 168 S.W.2d 1108 (1943). We do not agree, however, that moral fitness and financial ability are the only criteria by which to judge the right of a parent to the control and custody of children. In *Tucker* v. *Tucker,* 207 Ark. 359, 180 S.W.2d 571 (1944) it was declared that the prime concern and controlling factor is the best interest of the child, and the court in its sound discretion will look into the peculiar circumstances of each case and act as the welfare of the child appears to require. Parental rights are not to be enforced to the detriment or destruction of the happiness or well being

of the child. The rights of parents are not proprietary and are subject to their related duty to care for and protect the child and the law secures their preferential rights only so long as they discharge their obligations. *Watkins* v. *Dudgeon,* 270 Ark. 516, 606 S.W.2d 78 (Ark. App. 1980); *Pender* v. *McKee,* 266 Ark. 18, 582 S.W.2d 929 (1979); *Kirk* v. *Jones, supra; State* v. *Grisby, supra.* The unfitness for which this preferential right to custody may be forfeited can result from a parental failure to discharge any of the correlated duties of parenthood. In *Grisby* it was stated that this preference for natural parents is based on a presumption that they will take care of their children, bring them up properly and treat them with kindness and affection, and when that presumption has been dissipated chancery will interfere and place the child where those parental duties will be discharged by another.

A complete recitation of the evidence presented in this voluminous record would serve only to unduly lengthen this opinion. We recite only a portion of that evidence in stating our conclusion that findings by the chancellor that the appellant was an offending parent, had failed to discharge those related duties of a parent stated in *Richards, Grisby,* and *Watkins,* and that the interest of this child would best be served by placing him in the care of the appellees were warranted.

There was evidence that while his parents were still married the child was severely abused and beaten by his father on numerous occasions. On one occasion the child was taken to a doctor who notified SCAN, an organization which involves itself in families where there is suspected child abuse or neglect. SCAN then monitored the family for a period of five years. The appellant stated that prior to her divorce in 1979 the child was abused only by his father. There was evidence, however, that the physical abuse continued after the divorce. In 1981 he was hospitalized by a doctor as the result of a beating which the child initially said had been administered by his mother. He later accused his grandmother as the guilty party. As the result of that incident the child was removed from the mother's home by order of the juvenile court and placed in the custody of SCAN for a period of six months before being returned to his

mother, still under the observation of the organization. Although the physical evidence of bruises about his body and face were observed by the doctor, social worker and other lay persons, the mother denied that she ever saw the evidence of abuse on that occasion and attributed the accusation to fabrication.

In the spring of 1982 the child was again removed from the mother's custody by order of the juvenile court on her own complaint of delinquency resulting from behavior problems which she stated she was unable to handle by herself. The juvenile court placed him in the Paragould Children's Home and subsequently removed him to the appellees' home where he remained for more than a year prior to the hearing in this case.

Social workers, special education teachers and the appellees testified that although the boy had emotional, social and academic problems while in the mother's care, those problems were immediately relieved on both occasions when he was removed from her custody and placed in foster care. The social workers and teachers also stated that upon his return to his mother after release from the first juvenile order he immediately regressed in all areas. His social behavior regressed to such an extent after returning to his mother that even she could not handle him and sought the aid of the juvenile court.

If, in fact, only the father and grandmother had been guilty of physical abuse there was no indication that the appellant interfered to protect him. There was evidence, however, that appellant admitted to both SCAN and the social workers that she saw characteristics of the father in the boy and had taken out her hard feelings on him. There was evidence that there was a vast difference in the manner in which appellant treated her son and the way she treated his sister. Appellant was unduly harsh on the son and would not let him do many of the things being ordinarily done by children his age. On one occasion she punished him by requiring him to stand before his first grade class and suck on a baby bottle. The teacher ordered her to leave and contacted Social Services, who have monitored the child

since that time. They state that as a result of her treatment the child became withdrawn, unhappy and developed his emotional, social and academic problems. The sister, on the other hand, was permitted to do what all other children were permitted to do and was found to be normal and well adjusted in all areas.

The child testified that the happiest time in his life had been when he was living with the appellees and he hated living with his mother because he was beaten in her home. He likes the appellees and his school and the way his life is presently going. He thinks that his grades would improve if he is permitted to stay where he is and has threatened to run away if he is forced to return to his mother's residence.

There were home study reports made available to the court without objection which stated that from conversations with the mother and grandmother it was determined that the minor was unhappy at home, ran away often and would set fires in the house and break valuable things. These incidents were said to have occurred when he felt he was not loved and not receiving attention. It was shown that the grandmother was the authority figure in that home, and appellant took no responsibilities, and permitted her mother to make decisions about her life and those of her children. The appellant shared a two bedroom home with her mother and her brother, and her sole income was from aid to dependent children. There was other evidence including testimony of the family doctor that the mother was emotionally unstable and could not adequately deal with the stresses of life.

The social worker recommended that the child remain with the appellees. The home study reports reflected that appellees' home was much larger, in a more desirable location near his school and parks, and that appellees do not believe in severe discipline of children. Ross Jones was employed at Union Carbide with a monthly take-home pay in excess of $1,000. Glenda Jones had ceased her former employment when the child came into their home in order to spend more time tending to his needs. This report also recommended that the child remain with the appellees until

the appellant proved to be responsible enough to care for him or was willing to remove him from the grandmother's residence. The mother gave no indication that she was willing to do so.

From our review of the entire record and consideration of all of the surrounding circumstances we cannot conclude that the chancellor's findings that the appellant had not discharged her obligations of parenthood to this child and that his welfare and interest would best be served by placing him in the custody of appellees were clearly erroneous.

We affirm.

CORBIN and CLONINGER, JJ., agree.