Submitted on remand from the Oregon Supreme Court October 20, 2004, award of custody reversed and remanded; attorney fee award vacated and remanded; otherwise affirmed April 20, 2005

In the Matter of the Marriage of

Eric Michael WILSON,
*Respondent,*

*and*

Monique Alwien Quade WILSON,
*Appellant.*

Monique Alwien WILSON,
*Petitioner,*

*v.*

Eric Michael WILSON,
*Respondent.*

9908-67658, 0004-63675; A113524

110 P3d 1106

Mark Kramer and Kramer & Associates for appellant.

George W. Kelly for respondent.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Schuman, Judge.

SCHUMAN, J.

**SCHUMAN, J.**

After we decided this third-party custody dispute in favor of mother, *Wilson and Wilson*, 184 Or App 212, 55 P3d 1106 (2002), stepfather petitioned for Supreme Court review. While the petition was pending, the court decided *O'Donnell-Lamont and Lamont*, 337 Or 86, 91 P3d 721 (2004), *cert den*, ____ US ____ , 125 S Ct 867, 160 L Ed 2d 770 (2005), explaining how the United States Supreme Court's decision in *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), affects parental rights in Oregon. The court then allowed review in this case, vacated our decision, and remanded for reconsideration in light of *O'Donnell-Lamont. Wilson and Wilson*, 337 Or 327, 99 P3d 290 (2004). On reconsideration, we again reverse and remand.

In our first opinion in this case, we summarized the factual and legal background as follows:

"Husband and wife were married in September 1992. At that time, wife already had a 22-month-old daughter, C, from an earlier relationship. From the first days of their relationship, husband and wife have been more or less equally involved in nurturing and caring for C. Although husband never adopted C, he is the only father figure she has known; her natural father does not maintain any contact with either C or wife. C uses husband's last name and learned that he was not her biological father only after husband and wife separated. * * * Another daughter, E, was born to the parties in July 1995. * * *

"Each party acknowledges that the other has a strong and loving bond with the children. Those acknowledgments are remarkable, because shortly after E's birth in 1995, wife took a job working nights and weekends as a 9-1-1 operator, a situation to which husband reacted with resentment and jealousy, and the marriage became increasingly tense, so that by the time of the separation and litigation, the parties were locked in a relationship characterized by vitriolic noncooperation, mutual threats, and low-level violence. In three days of trial testimony and in extensive written submissions, each party attempted to draw a convincingly repugnant portrait of the other, complete with mutual accusations of assault, false reports to law enforcement authorities, psychological mistreatment of the children,

inability to subordinate selfish interests to the children's welfare, new relationships with unsavory partners, and other misdeeds, detailed recital of which would not serve the bar or bench and would affirmatively disserve the parties and the children.

"The trial court found that neither of the parties is the monster depicted by the other. The court found, rather, that 'other than their conflict with each other,' each is 'nurturing, attentive,' with 'adequate parenting skills.' That finding echoes the court-appointed custody evaluator's, and, on *de novo* review of the extensive record, we agree. The parties are both devoted parents who, trapped in the emotional vortex of a dramatically failing relationship, on a few occasions acted very badly to each other and to the children.

"We also agree with the trial court and the custody evaluator that, under the pure 'best interest of the child' standard applied in both child and stepchild custody cases at the time of this dissolution, husband prevails, albeit barely. The court made careful and detailed application of the 'best interest' factors in ORS 107.137(1)(a) to (f). In summary, it found that the children had closer emotional ties with husband's family than wife's; that husband had a 'slight edge' over wife with respect to the parties' attitude toward and interest in the children; that husband was 'in a better position and more inclined to continue and foster' relationships with other family members; that, although 'there's been a history here of mutual and extreme anger which has been borderline in terms of violence,' husband, unlike wife, 'has grown and learned how to deal with his anger'; that husband was the primary caretaker, once again by only a 'slight edge'; and that, with respect to each spouse's willingness and ability to foster a relationship between the children and the other spouse, a 'mixed picture' emerges with another slight advantage to husband.

"Based on those findings, the trial court awarded custody to husband. But because the trial court regarded the 'best interest' inquiry to be close, it ordered a visitation schedule approaching joint custody. Wife received parenting time Monday afternoon to Thursday morning during the school year and Mothers' Day; half of summer vacations; and alternate Christmas vacations, spring breaks, children's birthdays, and Thanksgivings."

*Wilson*, 184 Or App at 214-16.

We agreed with the trial court that, under the "best interest of the child" standard prevailing at the time of trial, husband had a slight advantage over wife for purposes of custody. However, we reversed and remanded on the basis of *Troxel*, where a majority of the United States Supreme Court agreed that legal parents[1] have a fundamental right under the Due Process Clause of the Fourteenth Amendment to the care, custody, and control of their children and that they cannot be deprived of that right under a mere "best interest of the child" standard. *Wilson*, 184 Or App at 217 (citing *Troxel*, 530 US at 66). Instead of the pure "best interest" test, we applied a standard derived from the 1997 version of ORS 109.119 as interpreted, after *Troxel*, in *Harrington v. Daum*, 172 Or App 188, 18 P3d 456 (2001). *Wilson*, 184 Or App at 218-19. That standard required us to give "significant weight" to the interest of fit biological parents because "a fit biological parent will presumptively prevail over a nonparent unless the nonparent presents compelling reasons to overcome that presumption, for example by showing that a ruling in favor of the biological parent will harm the child." *Id.* at 219. Under that standard, we held that father did not successfully rebut the presumption. *Id.* at 222.

■     We then turned to E, the biological child of both husband and wife, and applied a pure "best interest of the child" analysis according to ORS 107.137, the statute governing the rights of legal parents *vis-à-vis* each other. Because "[t]he emotional ties between the child and other family members" and "[t]he desirability of continuing an existing relationship" are both statutory factors in that analysis, ORS 107.137(1)(a), (c); because the "differences between [the parties' parenting] capabilities are minor"; and because wife was entitled to custody of C, we determined that it was also in E's

---

[1] We use the term "legal parent" to include biological parents and adoptive parents. *See* ORS 109.119(10)(d); ORS 419A.004(16). Troxel involved a dispute between a biological parent and grandparents and made no explicit distinction between biological parents, adoptive parents, and stepparents; the lead opinion uses the general term "parent." Oregon law, however, distinguishes between, on the one hand, "natural" parents and "adoptive" parents (whom we call "legal" parents), who are treated the same, ORS 109.041; ORS 109.050, and, on the other hand, foster parents, stepparents, and other nonparents. ORS 109.119(1). We presume that *Troxel*'s distinction between parents and nonparents matches Oregon's statutory distinction so as to confer on legal parents the fundamental right that nonparents lack.

best interest to be in wife's custody. *Id.* at 222-23. Recognizing that husband and wife were both capable parents, we instructed the trial court to order a parenting time schedule that essentially divided the children's time equally between them. *Id.* Subsequently, as noted above, father successfully petitioned for review by the Supreme Court; the case was remanded to us for reconsideration in light of *O'Donnell-Lamont.*

That case dictates a standard different from the one we used in *Wilson.* Initially, it holds that the 2001 version of ORS 109.119, not the 1997 version, governs.[2] *O'Donnell-Lamont,* 337 Or at 102. That statute provides, in part:

"(1)   Any person, including but not limited to a related or nonrelated foster parent, stepparent, grandparent or relative by blood or marriage, who has established emotional ties creating a child-parent relationship * * * with a child may petition or file a motion for intervention with the court having jurisdiction over the custody * * * of that child, or if no such proceedings are pending, may petition the court * * * for an order providing for relief under subsection (3) of this section.

"(2)(a)   In any proceeding under this section, there is a presumption that the legal parent acts in the best interest of the child.

"* * * * *

"(3)(a)   If the court determines that a child-parent relationship exists and if the court determines that the presumption described in subsection (2)(a) of this section has been rebutted by a preponderance of the evidence, the court shall grant custody * * * to the person having the child-parent relationship, if to do so is in the best interest of the child. * * *

"(4)(a)   * * *

"(b)   In deciding whether the presumption described in subsection (2)(a) of this section has been rebutted and whether to award custody, guardianship or other rights

---

[2] ORS 109.119 was amended in 2003, but the amendments do not affect our analysis.

over the objection of the legal parent, the court may consider factors including, but not limited to, the following, which may be shown by the evidence:

"(A)   The legal parent is unwilling or unable to care adequately for the child;

"(B)   The petitioner or intervenor is or recently has been the child's primary caretaker;

"(C)   Circumstances detrimental to the child exist if relief is denied;

"(D)   The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or

"(E)   The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor.

"* * * * *

"(8)   As used in this section:

"* * * * *

"(b)   'Circumstances detrimental to the child' includes but is not limited to circumstances that may cause psychological, emotional or physical harm to a child."

The statute "establishes a clear roadmap" for deciding third-party custody cases. *O'Donnell-Lamont*, 337 Or at 103. The first step is to determine whether the nonparent has established a child-parent relationship with the child whose custody is the object of the dispute. *Id.* If so, the second step is to determine whether the nonparent has, by a preponderance of the evidence, rebutted the presumption in favor of the legal parent; in making that determination, the court "may consider" the rebuttal factors in ORS 109.119(4)(b), weighing them not mathematically but on a case-by-case basis as appropriate. *ODonnell-Lamont*, 337 Or at 104, 109. The nonparent may overcome the presumption without showing that the legal parent will harm the child or is unable to care for the child. *Id.* at 107. The third step occurs only if the nonparent successfully rebuts the presumption; in that case, he or she will obtain custody but only if that is in the best interests of the child. *Id.*

■    Before applying the new standard to the facts in this case, we address two preliminary questions. First, father urges us to remand for further development of the record because of the passage of four years since trial and because that trial occurred before *Troxel*, *O'Donnell-Lamont*, and the enactment of the new statute. We conclude that remand is not necessary in this case. It is true that much time has elapsed since the trial. Appellate courts, however, necessarily adjudicate disputes that are artificially frozen in time and any attempt to defeat that anachronism would produce an endlessly recursive process. As for the change in the law, although such developments might warrant remand in some cases, we conclude that they do not in this one because the statutory amendments—at least the ones that are pertinent to this case—are not appreciably different from the relevant statutory factors that applied at trial.

■    Second, the parties disagree about which child's custody we should decide first. That is an issue because keeping bonded siblings together is a "rebuttal factor" that we consider in deciding the custody of stepchildren, *Austin and Austin*, 185 Or App 720, 728, 62 P3d 413 (2003), *rev den*, 337 Or 327 (2004), and also one of the statutory factors that we consider in deciding the custody of biological or adoptive children, ORS 107.137(a), (c). Thus, if we were to decide E's custody first, using, as we must, the "best interest" standard in ORS 107.137, we would conclude (as did the trial court) that father has the more compelling case, albeit by a small margin. *Wilson*, 184 Or App at 215. That conclusion, in turn, would factor into C's custody determination by adding weight to father's side of the calculus. On the other hand, if we were to decide C's custody first under ORS 109.119, we might conclude that father's attempt to rebut the presumption in favor of mother fails, and that conclusion would factor into E's custody determination by adding weight to mother's side of the calculus under ORS 107.137. In a close case such as this one, the order in which we take up the two children could determine the ultimate placement of both.

    The solution to the problem stems from the fact that, in this case, only one interest of recognized constitutional magnitude exists: mother's interest in C. Although mother and father both have fundamental rights to the care, custody,

and control of their biological children *as against third parties*, neither has such an interest against the other; the right arises only when the state would give force to the wishes of a nonparent. Thus, deciding the case in such a way as to allow father's statutory interest in custody of E to diminish mother's constitutional right to custody of C would be to elevate the subordinate over the dominant. *See Marbury v. Madison*, 5 US (Cranch) 137, 177, 2 L Ed 60 (1803) ("Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation * * *.").

We turn, then, to the question of C's custody. Mother agrees that father and C have "established the emotional ties creating a child-parent relationship," ORS 109.119(1), so we begin with the rebuttal factors, ORS 109.119(4)(b), repeated here for convenience:

"(A)   The legal parent is unwilling or unable to care adequately for the child;

"(B)   The petitioner or intervenor is or recently has been the child's primary caretaker;

"(C)   Circumstances detrimental to the child exist if relief is denied;

"(D)   The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or

"(E)   The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor."

Subparagraph (A) presents little difficulty. As noted above, husband does not argue that wife is unable or unwilling to adequately care for C. Although a finding on this factor that was adverse to wife would be fatal to her position, *O'Donnell-Lamont*, 337 Or at 110, the positive finding does not have an equally powerful effect; it merely keeps her from elimination at the outset.

Regarding subparagraph (B), the trial court found, and we agree, that husband was the primary caretaker of the children by a "slight edge." But, as the trial court explained, "in this case, [the preference for the primary caregiver] is not

of great significance because * * * for the last year [husband and wife] shared custody, and prior to that, there's a lot of evidence of both parents' involvement." We agree with the trial court that this factor, in this case, does not carry significant weight.

Subparagraph (C) requires us to determine whether circumstances that pose a serious present risk of psychological, emotional, or physical harm threaten C if father does not prevail. 337 Or at 112. Of course, in applying this factor, we must discount any risk C might incur if father does not prevail by the risk she might incur if he does. Under that standard, we conclude that no such risk exists. We agree with the trial court that both parents are nurturing and attentive and have adequate parenting skills. It is true, as father alleges, that mother moved three times in a relatively short period before trial and changed the children's school once. According to the court-appointed therapist, that conduct did not "demonstrate good insight into the children's stability needs." Failure to show good insight, however, is not the same as posing a serious risk of psychological harm, and even if it were, the conduct of father and his associates has been equally as deleterious.

Subparagraph (D) is readily dealt with; wife does not dispute that she "fostered, encouraged or consented to the relationship between the child and [husband]." However, we give this factor little weight because, under the circumstances of this case, the fact that mother consented to the relationship "does not indicate in any way that [s]he does not act in the best interests of the children." 337 Or at 116.

Regarding subparagraph (E), husband argues that wife "unreasonably denied or limited contact" between him and C when, on April 6, 2000, she obtained a restraining order against him under the Family Abuse Prevention Act. On the restraining order form in the section labeled "parenting time," mother checked the box that said "NO PARENTING TIME" and filled in the following reason: "Alleged physical abuse yesterday by respondent's girlfriend who resides in the home with respondent. No parenting time until child abuse team conducts interviews, hopefully by Monday April 10, 2000." On the same page, mother wrote, "After child

abuse team conducts their interviews with the children, respondent may have them every other Weds night, alternating with Thurs. am's thru Sunday night. 9 pm in the evenings, 8:30 am on Thurs am's." The result was that husband did not see the children for one month. Given that mother was concerned for the safety of the children and wanted to end visits only until the situation was investigated, which she hoped would be within a matter of days, we do not find her behavior unreasonable.

In sum, we reach the same conclusion regarding C under ORS 109.119 (2001) as construed in *O'Donnell-Lamont* that we reached in our first opinion in this case under the earlier version of the statute as construed in *Harrington*. Both parties are willing and able to provide adequate parenting. Husband, however, has not overcome, by a preponderance of the evidence, the presumption that wife "acts in the best interest of the child." *O'Donnell-Lamont*, 337 Or at 108. For the same reasons that we articulated in our first opinion, we also conclude that it is in the best interest of E to be in wife's custody. Also for the reasons articulated in that opinion, we vacate the award of attorney fees to father and remand for reconsideration in light of this opinion.

Award of custody reversed and remanded; attorney fee award vacated and remanded; otherwise affirmed.