David G. COFFEE and Kelly Lynn Coffee  *v.*
Gary ZOLLIECOFFER and Linda Zolliecoffer

CA 05-148                                              216 S.W.3d 636

Court of Appeals of Arkansas
Opinion delivered November 9, 2005

[Rehearing denied December 14, 2005.*]

---

* NEAL, CRABTREE, and BAKER, JJ., would grant rehearing.

*Witt Law Firm, P. C.*, by: *Neva B. Witt*, for appellants.

*James C. Manard*, for appellees.

JOHN B. ROBBINS, Judge. Appellants David and Kelly Coffee appeal the October 26, 2004 order of the Franklin County Circuit Court that granted custody of Kelly Coffee's fifteen-year-old daughter Kari Lynn Chambers to appellees Gary and Linda Zolliecoffer.[1] Appellants contend that the circuit court erred as a matter of law by not applying the correct legal standard to this request for a change of custody, and further that it was clearly erroneous to conclude that Kari's best interest was to be placed in appellees' custody. We affirm.

The following is a recitation of the facts leading to the present appeal. While a teenager, Kelly became impregnated by her boyfriend. Kelly gave birth to her daughter Kari on July 19, 1989. Kelly was seventeen at that time. During the next four years, Kelly lived with her boyfriend and their daughter in Ozark, Arkansas, for some period of time. However, the majority of Kari's first four years of life were spent living with Kelly in Linda and Gary's home in Altus, Arkansas.

In 1991, Kelly obtained an order establishing paternity and setting child support from Kari's biological father, though he did not participate much in her life and sent sporadic child support payments. The 1991 order stated that custody was vested in Kelly, the mother of the child.

In 1993, Kelly left appellees' home and did not seek court intervention to resume physical custody of Kari. Kelly was in a relationship with David at that time. Appellees believed that Kelly wanted them to raise Kari and did not want parental responsibility; Kelly explained that she was simply young and succumbed to Linda's refusal to allow her physical custody of Kari. Kelly regularly visited Kari and expended child-support payments for Kari's benefit, but Kari remained primarily in the grandparents' home

---

[1] Linda Zolliecoffer is Kelly Coffee's mother and Kari Lynn Chambers's grandmother; Gary Zolliecoffer is Kelly's stepfather and Kari's stepgrandfather. David is Kelly's husband and Kari's stepfather.

and attended the local school for the next several years. Kelly and David married in 1995, had twins in 1996, and moved to the Clarksville, Arkansas, area.

The instant litigation ensued after Kelly took twelve-year-old Kari to Clarksville on July 30, 2001, and did not return her to Linda. On August 3, 2001, appellees filed a petition for custody and requested an ex parte order of custody. An attached affidavit stated that Kari had lived with appellees her whole life, that Kari's biological father showed little interest in her life, that Kelly had not shown significant interest in Kari's upbringing, that Kelly took Kari against her will, and that the appellees were the only parental figures that Kari had known. The ex parte order was granted on August 3, 2001, and a sheriff's deputy brought Kari back to appellees.

Appellants responded with a motion to dismiss, asserting that there was no basis in law or fact to justify taking Kari from Kelly's custody. The response stated that appellants were married; that they were responsible and decent persons living in Clarksville, raising twins born in March 1996; that David was gainfully employed and Kelly was a stay-at-home mother; that Linda had physically attacked Kelly on numerous occasions during attempts to exercise her rightful custody; that Kelly had been removed from appellees' home by DHS at the age of eleven due to sexual abuse by appellee Gary; that appellants feared for Kari's well being in appellees' home; that Kelly, as Kari's natural parent, had priority in custody over Kari absent a finding of unfitness; and that Kari's best interest was served by remaining in her natural mother's legal and physical custody. The ex parte order remained in effect pending the full trial on the merits.

Appellants and appellees requested that a home study be performed on the opposing parties' homes; these requests were so ordered. The home study on appellees' home was conducted in February 2002, and the conclusion was that the home was well-maintained and suitable to provide a safe, secure, and nurturing environment for Kari. A negative factor was a finding of "true" in the Child Maltreatment Registry regarding an incident twenty years prior that involved appellee Gary. The home study concluded with a recommendation that the appellees be given custody.

The home study on appellants' home was conducted in October 2004, which revealed that appellants married in 1995 and lived in rural Clarksville. Kelly reported her history of being removed from appellees' home at age eleven; her return to

appellees' home when other placement options were exhausted; and her becoming a pregnant teen by her boyfriend Anthony Medlock. The report noted that David was employed as an electrician, and that Kelly stayed at home to care for Kari's eight-year-old half-siblings, who were also interviewed for purposes of the home study. The housing was clean, appropriate for adding Kari, and physically sound. The summary of the report stated that the family appeared to be functional, structured, and bonded, and that the social worker saw no reason to contraindicate placement with appellants.

At the trial conducted on October 12, 2004, Linda testified that Kelly chose to move out to be with David when Kari was about four years old and that she and Kelly had an altercation over that decision. Linda said that Kelly told her when she left that she could come back and get Kari anytime, to which Linda agreed. Linda had no problem with appellants' current residence in Clarksville or with Kari visiting, but she wanted Kari to continue living with her. Linda agreed that Kelly kept a savings account for child support payments and made purchases from that account on Kari's behalf for things like glasses and contact lenses. Linda denied that Kelly had demanded custody of Kari. Instead, she said that Kelly had regularly visited her daughter but expressed no desire to have Kari come live with her until the time of the ex parte order. As for the allegations that Gary sexually abused Kelly as a child, Linda did not believe it. Nonetheless, she recalled Kelly being absent from their home after those allegations until Kelly was about fifteen or sixteen years old.

Kari testified that she preferred to live with her grandparents, that she was a very good student, that she was in the tenth grade at Altus-Denning High School, and that she was a member of the basketball team. While Kari wanted to visit her mother, she got along with her twin siblings and stepfather and she enjoyed her visits, she said her mother did not ask her to come live with her until recently. Kari denied ever telling her mother that she wanted to live with her. Kari said she had never been abused by her grandfather. Kari did not want to change schools and wanted to stay where she was.

Kelly testified that she came back to live with appellees at the age of fifteen because her biological father, who lived in Texas, could no longer take care of her. Though Kelly said she and the baby lived with Anthony for a while, she ultimately ended up back at her mother and stepfather's house, despite her belief that her mother hated her. Kelly said that her mother physically and

emotionally abused her over the years, mainly because Linda did not believe Kelly's allegations of sexual abuse. Kelly said that she attempted to take Kari from her mother after she and David married but that Linda physically attacked her, screaming at her and banging her (Kelly's) head against the floor. Thereafter, Kelly said she was allowed to have visitation with and talk to Kari but not move her into her home. In summation, Kelly stated that she was terrified of her mother and had been as much a part of Kari's life as her mother would permit.

Regarding July 30, 2001, Kelly said that when she picked Kari up from a relative, Kari willingly went with her to Clarksville and wanted to stay. However, a few days later, a sheriff's deputy took Kari back to appellees. Kelly felt that her mother had been influencing Kari to see living with Kelly as a bad idea. Kelly expressed frustration that she should have to bring court action to regain custody she already had of her daughter.

Kelly had been in counseling since the spring of 2004, and her counselor testified that Kelly was a good parent in a solid marriage, but she needed counseling to work through her distress about her childhood abuse. He had no long-term therapy in mind and felt that Kelly had come a long way toward resolving her issues.

Kelly's husband David testified that they had tried several times to agreeably move Kari into their home, but that each time Linda would scare Kari into thinking she would not fit into a new school or keep any of her old friends. David said that when Kari came into their home in the summer of 2001, and several times before that event, she was ready to come live with appellants but was afraid to talk to her grandmother about it.

Both counsel offered closing arguments. In short, Kelly's attorney argued that the biological parent was given a preference unless proven unfit and that the child's best interest was to remain in her mother's legal custody, whereas Linda's attorney argued that the overriding consideration was at all times the best interest of the child that was best served by remaining in the only home Kari had known her whole life. The trial judge took the matter under advisement.

In a letter opinion dated October 15, 2004, he rendered his decision granting Linda custody. The letter stated that he considered the following in making his findings: the home studies; Kari's strongly stated preference, her health and age; the stability in employment, finances, and emotions; residence; health; love and affection; attention paid to the child; and educational attitudes. The letter opinion read in pertinent part:

Whether this matter is considered an initial proceeding or a modification proceeding, the polestar remains the best interest and welfare of the child, Kari Lynn Chambers, who is now fifteen years of age. While there is a preference in custody cases to award a child to its biological parent, that preference is not absolute. Rather, of prime concern, and the controlling factor, is the best interest of the child.

The judge then found that it was in Kari's best interest to be placed in the custody of her grandmother Linda and that Kelly should be granted reasonable visitation privileges but should not be ordered to pay child support. A formal order incorporated this letter opinion, and a timely notice of appeal followed.

Appellants contend that the trial court clearly erred in entering an order changing custody of Kari from appellant Kelly to appellee Linda because (1) the trial court applied an incorrect legal standard, and (2) alternatively, even if the trial court used the correct legal standard, the decision to take custody from Kelly was clearly erroneous.

The standard of review in child-custody appeals is well settled. We review the evidence de novo, but we will not reverse the findings of fact unless it is shown that they are clearly contrary to the preponderance of the evidence. *Thompson v. Thompson*, 63 Ark. App. 89, 974 S.W.2d 494 (1998). We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases. *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999). A finding is clearly against the preponderance of the evidence when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999). *See also Dunham v. Doyle*, 84 Ark. App. 36, 129 S.W.3d 304 (2003). With regard to errors of law, however, no deference is given to the trial court's decision. *See Sanford v. Sanford*, 355 Ark. 274, 137 S.W.3d 391 (2003).

The substantive law on this topic is equally well settled. The law prefers a parent over a grandparent or other third person, unless the parent is proved to be incompetent or unfit. *See, e.g., Schuh v. Roberson*, 302 Ark. 305, 788 S.W.2d 740 (1990); *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988); *Jones v. Strauser*, 266 Ark. 441, 585 S.W.2d 931 (1979); *Payne v. Jones*, 242

Ark. 686, 415 S.W.2d 57 (1967); *Riley v. Vest*, 235 Ark. 192, 357 S.W.2d 497 (1962). The preference is based on the child's best interests. *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988). The right of natural parents to the custody of their children as against others is one of the highest of natural rights, and the state cannot interfere with this right simply to better the moral and temporal welfare of the child as against an unoffending parent. *Payne v. Jones, supra.* The test as to custody between a natural parent and a third person has never been based solely upon who can do the most for the child. *Rayburn v. Rayburn*, 231 Ark. 745, 332 S.W.2d 230 (1960). However, the parental preference is not absolute. *Freshour v. West*, 334 Ark. 100, 971 S.W.2d 263 (1998). Rather, of prime concern, and the controlling factor, is the best interest of the child. *Id.* The rights of parents are not proprietary and are subject to their related duty to care for and protect the child; the law secures their preferential rights only as long as they discharge their obligations. *Id.*; *Lloyd v. Butts*, 343 Ark. 620, 624, 37 S.W.3d 603, 606 (2001); *Holmes v. Coleman*, 195 Ark. 196, 111 S.W.2d 474 (1937); *Jones v. Jones*, 13 Ark. App. 102, 680 S.W.2d 118 (1984); *Watkins v. Dudgeon*, 270 Ark. 516, 606 S.W.2d 78 (Ark. App.1980).

▮ Recognizing the parental preference, our supreme court held in *Crosser v. Henson*, 357 Ark. 635, 187 S.W.3d 848 (2004), that in the context of a guardianship proceeding:

> Determining whether the child is to be better off with one party versus another is precisely what the court should decide. The natural-parent preference and the fitness of that parent are not the absolute determinants in custody-modification matters, as our case law makes clear.

By way of example, in *Freshour v. West, supra*, our supreme court affirmed the grant of custody to the child's maternal grandparent, despite the natural father's attempt to gain custody. The child had been left in the grandparent's care for a number of years, but the absent father later rectified his life and endeavored to provide as a parent to the child. The trial court was posed with a similar argument by that father, seeking to have custody vested in him because he was not proven to be "unfit." The supreme court affirmed the trial court ruling, and it noted that the trial court recognized the law's preference

for custody to be with the natural parent, but after consideration of relevant factors, decided that such placement was not in the child's best interest. *See id.*

*Crosser v. Henson, supra,* cited to *Jones v. Strauser,* 266 Ark. 441, 585 S.W.2d 931 (1979), which rejected a father's request to change custody of his daughter from the maternal grandparents to him, noting the parental preference. The *Jones* opinion agreed that ordinarily a natural parent will be granted custody absent a finding of unfitness. However, Mr. Jones had permitted the maternal grandparents to have custody, effectively abandoning his child for the first five years of her life. The supreme court affirmed the trial court's refusal to place the child with the father, holding that while his parental preference was not thereby forfeited forever, its effect was so diminished that he had the burden to show that taking the child from the grandparents was in her best interest.

We hold that the trial court set forth its understanding that there exists a preference for the natural parent to have custody over all others, but that the "polestar" and paramount consideration is at all times the best interest of the child, which can overcome the parental preference when a child is left in the care of a non-parent for a substantial period of time. *See also* 15 A.L.R. 5th 692, "Continuity of Residence as a Factor in Contest Between Parent and Non-Parent – Modern Status" § 35. Therefore, we hold that the trial court applied the correct legal standard and did not err as a matter of law. *See also Beavers v. Smith,* 223 Ark. 43, 264 S.W.2d 617 (1954).

Appellants argue in the alternative that the trial court clearly erred in finding that Kari's best interest was to be placed in her grandmother's custody, particularly in light of the allegations of sexual abuse perpetrated by Gary. We hold that the trial court's finding on Kari's best interest is not clearly erroneous. It is difficult to countenance Kelly's concern about sexual abuse when she permitted her child to live with appellees for at least twelve years without seeking to have her physical custody restored or seeking to have the state investigate any perceived threat to Kari in appellees' care. Moreover, we must give due deference to the trial judge's superior position to evaluate the credibility and weight to be given to the testimony and evidence in this case. *See Hamilton v. Barrett, supra.* Kari denied that she was ever subjected to abuse by her grandfather. The trial judge here was obviously swayed by the fifteen-year-old's strong preference to stay in the only home,

school, and social life she had ever known; by the fact that her grandparents were willing and able to finish raising Kari; and by the absence of any evidence that Kari was being or had been abused in her grandparents' care. After our de novo review, we cannot conclude that the trial court's findings regarding Kari's best interest were clearly erroneous or clearly against the preponderance of the evidence.

Affirmed.

PITTMAN, C.J., and HART and GLOVER, JJ., agree.

VAUGHT and CRABTREE, JJ., concur.

GLADWIN, GRIFFEN, and NEAL, JJ., dissent.

LARRY D. VAUGHT, Judge, concurring. Although I agree with the dissent that this case should be reversed, I vote to affirm solely because I am required to follow the decisions of our supreme court. Unlike the majority, I do not believe that the most recent pronouncements on "parental preference" follow the precedent set in earlier cases or in the Arkansas statutes. Under *Crosser v. Henson*, 357 Ark. 635, 187 S.W.3d 848 (2004), there is no longer a parental preference — only a parental "factor" to be considered when determining what is in the best interest of the child.

The idea that a fit parent is presumed to be acting in a child's best interest is not a novel idea. The case law in nearly every jurisdiction supports this proposition. *See, e.g., G.H. v. K.G.*, 909 So. 2d 206 (Ala. Civ. App. 2005); *Andrea S. v. David R.*, 116 P.3d 589 (Alaska 2005); *Allen v. Proksch*, 832 N.E.2d 1080 (Ind. Ct. App. 2005); *Williams v. Phelps*, 961 S.W.2d 40 (Ky. Ct. App. 1998); *McDermott v. Dougherty*, 869 A.2d 751 (Md. 2005); *Johnson-Smolak v. Fink*, 703 N.W.2d 588 (Minn. Ct. App. 2005); *Thomas v. Purvis*, 384 So. 2d 610 (Miss. 1980); *Scott v. Scott*, 147 S.W.3d 887 (Mo. Ct. App. 2004); *In re Guardianship of Brenda B.*, 698 N.W.2d 228 (Neb. Ct. App. 2005); *Bevins v. Witherbee*, 798 N.Y.S.2d 245 (N.Y. App. Div. 2005); *In re Marriage of Wilson*, 110 P.3d 1106 (Or. Ct. App. 2005); *Jordan v. Jackson*, 876 A.2d 443 (Pa. Super. Ct. 2005); *In re Clifford K.*, 619 S.E.2d 138 (W. Va. 2005). In the context of grandparent visitation, the Supreme Court of the United States has stated that the interest of parents in the care, custody, and control of their children is perhaps the oldest of fundamental liberty interests. *See Troxel v. Granville*, 530 U.S. 57 (2000). Furthermore, in a long line of decisions, the Court has

recognized that the "liberty" protected by the Due Process Clause includes the right of parents to establish a home, to bring up their children, and to direct the upbringing of their children without hindrance from the state. *See, e.g., Washington v. Glucksberg*, 521 U.S. 702 (1997); *Santosky v. Kramer*, 455 U.S. 755 (1982); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923).

In *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002), our supreme court cited and quoted liberally from *Troxel* in establishing the parameters of grandparent visitation in Arkansas; the *Linder* court concluded that the appellant — a single, fit parent — had a fundamental right under the Fourteenth Amendment to be free from state intrusion on her parenting of her minor child. While the cases differ slightly when addressing visitation, custody, or guardianship, the polestar is always the same — the best interest of the child. However, a fit natural parent is *presumed* to be acting in the best interest of the child. This is the essence of the parental preference — that it is in the best interest of a child to be placed in the custody of a fit parent over a non-parent. Barring exceptional circumstances, this preference satisfies the best-interest standard.

In this case, Kelly is a fit mother who, for her child's benefit, allowed the appellees to participate in her child's upbringing. She never abandoned the child, she participated in the child's life, she provided support when she was able, and she is now in a stable and supportive marriage. That should be the end of the story, but it is not.

In *Crosser, supra,* our supreme court concluded that "[d]etermining whether the child is to be better off with one party versus another is precisely what the court should decide. The natural-parent preference and the fitness of that parent are not the absolute determinants in custody-modification matters, as our case law makes clear." Therefore, we are bound not by a preference but by a determination of the trial court's finding that the child is better off with the appellees than with Kelly.

That finding is not clearly erroneous, and we must affirm. This conclusion is based on the holding of our state's highest court, and I am bound by its reasoning. However, I feel compelled to express my concern that this precedent comes dangerously close to violating a fit parent's fundamental right protected by the Fourteenth Amendment to raise a child without state intrusion. To me,

a requirement that the trial court look beyond parental fitness, beyond our legislatively mandated natural-parent preference, and simply determine "whether the child is to be better off with one party versus another" too severely subjugates the rights of natural, fit parents and cannot be reconciled with their fundamental right to raise their children. With this pronouncement of law, we have thrown otherwise qualified parents into a subjective minefield pitting them against possibly more mature, more capable, or more affluent grandparents, siblings, or others.

WENDELL GRIFFEN, Judge, dissenting.

*"It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."*
— *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

*"The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children."*
— *Parham v. J.R.*, 442 U.S. 584, 602 (1979).

*"[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."*
— *Troxel v. Granville*, 530 U.S. 57, 68-69 (2000).

Sadly, it appears that the majority has decided to eviscerate one of the most fundamental rights: that of a fit parent to exercise custody, care, and nurture over her child without meddlesome interference by the government. It is not a challenge to find a case supporting the proposition that "a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment." *Troxel v. Granville*, 530 U.S. 57, 77 (Souter, J., concurring) (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997); *Santosky v. Kramer*, 455 U.S. 745 (1982); *Parham v. J.R.*, 442 U.S. 584 (1979); *Quilloin v. Walcott*, 434 U.S. 246 (1978); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923)). Yet, despite the clear, longstanding, and

respected legal preference for upholding the rights of a parent to have custody of her child against the competing claim of a third party unless the parent is judicially determined to be unfit, the majority today has denied the claim of a mother to exercise custody over her daughter without even an allegation of unfitness, let alone proof of unfitness. Like Judge Vaught in his concurring opinion, I decry this decision and the reasoning behind it. However, I cannot join the majority in imposing this result for reasons set forth below.

As admitted by the majority opinion, the prime and controlling factor in child-custody cases is the best interest of the child. *Schuh v. Roberson*, 302 Ark. 305, 788 S.W.2d 740 (1990); *Dunham v. Doyle*, 84 Ark. App. 36, 129 S.W.3d 304 (2004). However, it is established law in Arkansas that "the law prefers a parent over a grandparent or other third person, unless the parent is proved to be incompetent or unfit." *Dunham*, 84 Ark. App. at 40, 129 S.W.3d at 306-07. While this preference is not absolute, *Freshour v. West*, 334 Ark. 100, 971 S.W.2d 263 (1998), it shall not be taken lightly. Our law has always stated that a third party seeking to deprive a parent of custody must first show that the parent is not a suitable person to have the child. *Schuh v. Roberson, supra; Riley v. Vest*, 235 Ark. 192, 357 S.W.2d 497 (1962). The law establishing the natural-parent preference "must prevail unless it is established that the natural parent is unfit." *Schuh*, 302 Ark. at 306-07, 788 S.W.2d at 741 (citing *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988); *Perkins v. Perkins*, 266 Ark. 957, 589 S.W.2d 588 (Ark. App. 1979)).

The common law established this preference because the law presumes that a fit parent will act in a child's best interests. *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002); *see also Parham*, 442 U.S. at 601 ("[H]istorically [the law] has recognized that natural bonds of affection lead parents to act in the best interests of their children."). Until clear evidence has been presented that demonstrates parental conduct concerning the child that rebuts the presumption of parental benevolency, government has no legitimate reason to deny the right of a parent to exercise custody over her child. For government to act in this fashion without such clear proof of unfitness is, in my view, a clear denial of a parent's right to due process of law as guaranteed by the Fourteenth Amendment to the federal Constitution.

The majority states, "The rights of parents are not proprietary and are subject to their related duty to care for and protect

the child; the law secures their preferential rights only as long as they discharge their obligations." However, the burden of proving failure to discharge the parental obligation has never been met by mere proof that an otherwise benevolent parent entrusted her children in the care of another party for a period of time:

> Courts are very reluctant to take from the natural parents the custody of their child, and will not do so *unless the parents have manifested such indifference to its welfare as indicates a lack of intention to discharge the duties imposed by the laws of nature and of the state to their offspring suitable to their station in life.* When, however, the natural parents so far fail to discharge these obligations as to manifest an abandonment of the child and the renunciation of their duties to it, it then becomes the policy of the law to induce some good man or woman to take the waif into the bosom of their home, and when they have done so and, through their attentions to it, have learned to love it as if it were their very own child, this bond of affection will not then be severed, although the natural parent may later repent his breach of the laws of nature and of the state and offer to resume the duties and obligations which he should never have ceased to perform.

*Holmes v. Coleman*, 195 Ark. 196, 198-99, 111 S.W.2d 474, 476 (1937) (emphasis added), *quoted in Lloyd v. Butts*, 343 Ark. 620, 624, 37 S.W.3d 603, 606 (2001); *Dunham*, 84 Ark. App. at 47, 129 S.W.3d at 311.[1]

The instant case is totally different from cases such as *Larkin v. Pridgett*, 241 Ark. 193, 407 S.W.2d 374 (1966), or *Jones v. Strauser*, 266 Ark. 441, 585 S.W.2d 931 (1979), where the natural parent was completely out of the child's life for a significant portion of time, thus indicating abandonment of the parental role. Kari Chambers was, to be sure, in the physical custody of her grandparents; however, the evidence shows that Kelly Coffee still played a role in her life, regularly visiting her and supporting her. Furthermore, there was unmistakable evidence that the strained relationship between Kelly Coffee and Linda Zolliecoffer made it difficult for Kelly and Kari to have a normal parent–child relation-

---

[1] By analogy, to establish abandonment in an adoption case, one must present evidence showing that "the parent deserted, forsook entirely, or relinquished all connection with, or concern in, the child." *Zgleszewski v. Zgleszewski*, 260 Ark. 629, 632, 542 S.W.2d 765, 767 (1976) (internal quotes omitted).

ship. Remarkably, the mother in this case is not only being denied the benefit of the natural-parent preference; today's holding works to *reward* a third party whose conflict with the parent has operated to the detriment of the parent-child relationship that the natural-parent preference — along with the rest of the law — exists to protect and foster. Thus, in this decision our court actually penalizes a parent by stripping her of the custody right and puts that parent in the very dilemma that Judge Vaught has mentioned in his concurring opinion.

I am especially concerned about the effect that this holding will have on children whose fit parents make the difficult decision to entrust them with other family members during challenging times. It is not at all unusual for children to be delivered by loving and supporting parents into the care of other family members. Sometimes this occurs to shield the children from the strain of marital discord involving the parents. Children have also been entrusted into the custody of relatives for long periods of time so that they could attend schools or be removed from influences or conditions that their parents considered undesirable, if not threatening. I am very concerned that the holding reached by the majority today operates to treat the parents who make such choices as if they were uncaring, unloving, and unfit to raise their children merely because they may be less affluent, educated, or socially attractive than some third party. My concern grows to the point of alarm as I consider that the parent in this case has never been ever alleged to be unfit, let alone proven unfit. Rather, the law has stripped her of the most fundamental right of parenthood — the right to exercise custody over her own child, without even requiring proof that she did anything — or failed to do something — so as to justify such a disruptive decision.

Today's opinion is an outright, and unwise, rejection of the longstanding principle that a natural parent has a fundamental right to raise his or her children unless shown to be unfit. Absent a showing of unfitness, I continue to believe that it is in a child's best interest to be in the custody of a natural parent and that a fit parent has the right to decide where, and with whom, her child should live. Because the majority's decision goes against this basic principle, I must respectfully dissent.

I am authorized to state that Judges GLADWIN and NEAL join in this opinion.

## SUPPLEMENTAL OPINION ON DENIAL of REHEARING
### DECEMBER 14, 2005

*Witt Law Firm, P.C.*, by: *Neva B. Witt*, for appellants.

*James C. Mainard*, for appellees.

JOHN B. ROBBINS, Judge. Appellants David G. Coffee and Kelly Lynn Coffee have filed a petition seeking a rehearing of their appeal following our affirmance of November 9, 2005. Although we deny their petition, we supplement our majority opinion to briefly address appellants' contention that we have ignored their constitutional rights under the Due Process Clause of the Fourteenth Amendment. *See Troxel v. Granville*, 530 U.S. 57 (2000).

While we will not express an opinion as to the disposition of their appeal had this issue been properly presented to us, we remind appellants and the bar that, on appellate review, issues of even constitutional dimension are waived if not presented to the trial court and a ruling obtained. *See London v. State*, 354 Ark. 313, 125 S.W.3d 813 (2003); *Taylor v. Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001); *Warnock v. Warnock*, 336 Ark. 506, 988 S.W.2d 7 (1999); *Dansby v. Dansby*, 87 Ark. App. 156, 189 S.W.3d 473 (2004); *Tipton v. Aaron*, 87 Ark. App. 1, 185 S.W.3d 142 (2004). In the instant case, this constitutional argument was not raised before the trial court, nor was it even raised by appellants in their briefs before us. It is now raised for the first time in a petition for

rehearing. It comes too late, and we would violate a fundamental appellate rule to decide such issue.

Rehearing denied.

PITTMAN, C.J., HART, GLADWIN, GLOVER, and VAUGHT, JJ., agree.

NEAL, CRABTREE, and BAKER, JJ., would grant.